## ASSOCIATION OF INDEPENDENT TAXI OPERATORS, INC., ET AL. *v.* YELLOW CAB COMPANY ET AL.

[No. 160, October Term, 1950.]

184

Decided June 15, 1951.

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON and HENDERSON, JJ.

*Charles G. Page,* with whom was *J. Calvin Carney* on the brief, for the appellants.

*Nicholas G. Penniman, III,* for the Yellow Cab Company.

*George W. Constable* and *James R. Crook, Jr.,* with whom were *William Pepper Constable* and *Constable & Alexander* on the brief, for the Pennsylvania Railroad Company and the Northern Central Railway Company.

*Daniel B. Leonard, Assistant City Solicitor of Baltimore,* with whom was *Thomas N. Biddison, City Solicitor,* on the brief, for the Mayor and City Council of Baltimore.

*Kenneth C. Proctor, Assistant Attorney General,* with whom was *Hall Hammond, Attorney General,* on the brief, for Beverly Ober, Commissioner of Police of Baltimore City.

MARBURY, C. J., delivered the opinion of the Court.

The amended bill of complaint which is before us in this case was filed by the Association of Independent Taxi Operators, Inc., and certain individual members who own and operate taxicabs under permits of the Public Service Commission. It may be noted here that, under our decisions, the corporate plaintiff, as described in the bill, is not a proper party plaintiff (Maryland Naturopathic Ass'n, Inc. v. Kloman, 191 Md. 626, 62 A. 2d 538. Beckett v. Housing Authority, 198 Md. 71, 81 A. 2d 215, this term), but as the individual plaintiffs undoubtedly have the right to bring such a suit, that question is not important to our decision. The defendants are the Yellow Cab Company, the Northern

Ceneral Railway Company, the Pennsylvania Railroad Company, the Mayor and City Council of Baltimore, and the Police Commissioner of Baltimore City. The purpose of the suit is to define the status of the taxicab stand at Pennsylvania Station in Baltimore. The facts, as developed in the hearing, are adequately stated by the chancellor in the following words:

"In 1911, the Pennsylvania Railroad, either as owner or as lessee of the Northern Central Railway Company, erected the Pennsylvania Station on the site of the old Union Station, on a plot of land near Jones Falls, between Charles Street and St. Paul Street, in Baltimore City. The Station consists of a large stone building, south of which there is a driveway running from St. Paul Street to Charles Street, in a generally east and west direction, approximately forty feet wide and 400 feet long. The driveway connects with St. Paul Street at grade on the east, and with Charles Street at grade on the west, and is used for ingress and egress to and from the Pennsylvania Station, it being south of the principal passenger entrance of the Station. The driveway serves vehicles bringing passengers to and from the Station, and is paved with asphalt paving similar to that on Charles and St. Paul Streets. It is carried by a steel and concrete structure which was built at the same time as the Station, and in some respects forms an integral part of the Station building. Below the driveway is a lower station level, approximately at the same elevation as the railroad tracks; and leading down to this lower level on the south side of the driveway is a ramp, which is used for access to the baggage department of the railroad, and perhaps for other purposes. There are no gates at either Charles or St. Paul street end of the driveway.

"The driveway was constructed at the expense of Pennsylvania Railroad, and the cost was later charged back to the Northern Central Railway, as

the basic owner. The relation between those two corporations is that the Northern Central Railway has title to the land; the Pennsylvania Railway is lessee under a lease for 999 years, executed in 1914 but dated back to 1911. The Pennsylvania Railroad is the operator of the station; it pays for the cleaning and lighting and the removal of snow and the paving of the driveway. It also polices the driveway, and Pennsylvania Railroad Police are assigned to that duty. On the driveway there are various signs for the direction of traffic, indicating, among other things, that traffic must be from east to west. Lines are painted on the pavement, indicating parking areas, and there is a raised platform or safety zone directly opposite the main entrance to the Station, by which there are created at least two traffic lanes for passenger vehicles approaching the Station. The northernmost or 'inside' lane, that is the one next to the Station, has signs on it indicating that it is for the use of Yellow cabs and the testimony is that the Pennsylvania Railroad police and the Yellow Cab Company together reserve this 'inside' lane for the use of Yellow cabs exclusively in so far as they are able to do. The southernmost or 'outside' lane is used by private vehicles and by taxicabs other than Yellow cabs. Both the Station and the driveway are open twenty-four hours a day, every day in the year, except in so far as repairs make partial closing necessary.

"There has been no cab stand designation made by the Police Commissioner for a cab stand in the driveway in front of the Station. The legal status of the driveway does not depend upon a designation by the Police Commissioner, however, but upon other considerations. In 1921, the Pennsylvania Railroad entered into a contract with the taxicab company which was the predecessor of the present Yellow Cab Company, which contract has been renewed continuously from time to time by contracts

which have been introduced in evidence. The last renewal was made by a letter dated December 2, 1947, under which the previous agreements were extended under an arrangement whereby Yellow Cab Company pays the Pennsylvania Railroad Company $750 per month for the privileges set forth in the prior agreements as modified. The essential clause which is involved in these proceedings is the second paragraph of the agreement of September 10, 1921, which reads as follows:

" 'Second. The Railroad Company hereby agrees that in so far as it legally and properly can, consistently with its public duty and contractual obligations, it will not permit other persons engaged in the same business to enter upon its premises at said station for the purpose of soliciting patronage, but it shall not be required to prevent local teamsters, hackmen or carriers of passengers and their baggage or others, from entering upon said premises with their vehicles, cabs, and teams at the instance of, and by arrangement with, departing or arriving passengers for the conveyance of passengers or their baggage or other property to and from said station; nor shall this agreement apply to or prevent private teams and vehicles, in which no fare is charged, from entering upon its premises for the conveyance of passengers and baggage; nor shall this agreement apply to or prevent persons or corporations from entering upon the premises of the Railroad Company for the purpose of taking baggage or passengers to or from said station, under contracts heretofore made or which may be hereafter made with the said Railroad Company.'

"The net result of the operation is simply this: both the Railroad Company and the Cab Company consider that under their agreements the Yellow cabs have the exclusive right to solicit patronage of passengers who are leaving the station, and they reserve the inner or northernmost traffic lane for

Yellow cabs. Other cabs are allowed to come in and discharge passengers. The Railroad police make every effort to prevent other cabs from soliciting patronage within the driveway. If the other cabs do not move on after having discharged their passengers, they are told to move by the Pennsylvania Railroad police. On the other hand, if passengers waiting for cabs solicit the other cabs at Pennsylvania Station, neither the railroad nor the Yellow Cab Company men make any effort to prevent such other cabs from taking passengers. The right of the Yellow Cab Company is regarded by the Railroad and by the Cab Company as an exclusive privilege, and both companies make every effort to enforce it.

"It also appears from the evidence that certain persons use the driveway for the purpose of transportation from St. Paul Street to Charles Street, although such persons are not on railroad business. The testimony is quite indefinite as to how many persons use the station in that way, although it is clear that some do."

The complainants ask that the taxicab stand be determined as subject to the provisions of Ordinance No. 201, later known as Ordinance No. 126, which prohibits certain areas designated by the Police Commissioner as taxicab stands from being for the exclusive use of one taxicab company (*G. I. Veterans' Ass'n v. Yellow Cab Co.*, 192 Md. 551, 65 A. 2d 173, 8 A. L. R. 2d 568), and ask for an injunction against the defendants to prevent them from attempting to arrest or molest the plaintiffs, or any other licensed taxicab operators, in the use of the Pennsylvania Station taxicab stand. The chancellor decreed that the driveway was not a public street, that the use of it by taxicabs is not subject to the provisions of Ordinance No. 126, denied the other prayers of the amended bill, and, except as to the declarations in the decree, dismissed the bill.

The appellants contend that the station drive is a public street, that the Railroad has no right to grant a practical monopoly to one taxicab company, that its contract with the Yellow Cab Company discriminates against the plaintiffs, and that the enforcement of the contract and the practices of the Railroad under it, should be enjoined, and this, whether or not the driveway is held to be a public street. The Railroad admits that, if the driveway is a public street, then it has no right to establish a taxicab stand on it especially for the use of any particular company, either in whole or in part. We will, therefore, consider this question first.

Appellants give three reasons for their contention that the drive is a public street—one, there is a common law dedication; two, there is a statutory dedication; three, there was a twenty-year adverse user. Under the theory of common law dedication, it is stated that the railroad built the present station between two bridges which run over the Pennsylvania tracks and form the respective beds of Charles Street and St. Paul Street. The drive which had previously existed in part was amplified and extended to St. Paul Street. See Ordinance No. 376, approved July 29, 1909, and *Northern Central Ry. Co. v. United Railways Co.,* 105 Md. 345, 66 A. 444. Since this drive was constructed, the evidence shows that the general public had used it as a cut-through, and, while the chancellor did not permit all the evidence proffered by the plaintiffs to be heard, it is apparent that this has been done. No warning was given by the way of signs that the general public could not use the drive in this way, and the plaintiffs claim that the location, and the uninhibited use by the public, show an intention to dedicate, which has existed since the time the drive was constructed. We are unable to agree with this contention. It seems to be perfectly clear that the purpose of the driveway was to afford an ingress and egress to the Railroad property by those persons having business with the railroad. As the station necessarily operates on a twenty-four-hour basis, and never closes,

the drive must remain open, and it is entirely imprac-
ticable (even if it would be good business or good com-
mon sense) for the employees of the Railroad to stop
each vehicle entering the drive to enquire whether it
is merely passing through, or whether the occupants
have business with the Railroad. The fact that the
Railroad did not do this, or put up a sign, does not evince
any intention on its part that the drive should be used
as a general public thoroughfare, and, in fact, the testi-
mony given and offered shows that only a small propor-
tion of the vehicles entering the driveway are those which
use it as a passageway from St. Paul Street to Charles
Street, and have no business with the Railroad. The
evidence shows that the Railroad paves the drive, polices
it, lights it, keeps it in repair, and pays taxes on it.
Merely because it did not put up a sign forbidding gen-
eral public use, or did not adopt some wholly impractical
method of trying to ascertain the purpose of any vehicle
entering the driveway, does not indicate an intention
to dedicate. The leaving open of land as a means of
access to the owner's premises and thereby permitting
the public to use it for passage is slight, if any, evidence
of such an intention. Tiffany, Real Property, 3rd Ed.,
Vol. 4, Paragraph 1102, page 341, and cases cited.

Appellants further contend that there was a statutory
dedication of the drive under the Act of 1908, Chapter
582. Under that act, as amended and codified as part
of Section 691 of the Baltimore City Charter, it is pro-
vided that every private street, lane, alley, or way here-
after laid out and opened, which for a period of one year
shall connect with any public street and the passage
between such private street, etc., shall not be barred
or obstructed by a wall, fence, either with or without
a gate, "shall be conclusively presumed to have been
dedicated by the owner or owners thereof to public
use as public highways, * * *." Appellants point out
that as the entrance to the drive was not barred and
there was no gate there, the presumption attached the
year after the bridge was constructed. The City does

not agree with this contention. It suggests that the real reason for the passage of this statute was that in the case of *Canton Co. v. Baltimore City,* 106 Md. 69, 66 A. 679, 67 A. 274, 11 L. R. A. N. S., 129, it has been held that a dedication could be revoked, and the statute was intended to change this. Whatever may have been the purpose of the statute, we think there would be grave doubt of its validity if it should be applied in cases where the method of the construction and opening of a street or lane or drive clearly indicated that it was not intended to be dedicated to public use as such. As we have already shown, the drive was not intended for that purpose, and to permit it to be taken by the City under the statute would be an appropriation of private property without compensation. We cannot assume that the Legislature intended to say that there would exist a conclusive presumption against a property owner unless he did the things set out in the statute, where he did not lay out and open a street as a public highway, but evidently opened it only for the use of those people coming to do business with him—his customers, clients, patients, etc. A statute cannot effectually declare that title to property now vested in A shall be vested in B. *Queen v. Anderson,* 191 Md. 522, 532, 62 A. 2d 612, 616. As the chancellor remarked in his opinion, under the interpretation of the law claimed by the appellants, every private driveway in Baltimore City has become a public street. He gives as illustrations the driveway leading to Johns Hopkins University and that leading to Johns Hopkins Hospital, also the entrance to Sears, Roebuck & Company, and the entrance to St. Agnes Hospital. We might add the entrance to every filling station. We are unable to adopt the contention of the appellant that intention is immaterial under the terms of the statute. It cannot constructively presume an intent that is contrary to the manifest intent. *Mahoney v. Byers,* 187 Md. 81, 48 A. 2d 600. The City has not attempted to take the point of view of the appellants that the driveway has been dedicated to the use of the

public, and has not attempted in any way to accept it. Ordinance No. 753 of 1922 accepts only those streets which have been heretofore "unconditionally dedicated", and that is not the case with the station drive. And the Pennsylvania Railroad was only a lessee from the Northern Central and could not bind the latter company in any event. Under all the circumstances, without attempting a discussion of the numerous cases on the subject heretofore decided, we conclude that there was no statutory dedication of this drive under the Act of 1908.

The third reason given by the appellants that there has been a twenty-year adverse user is put upon the same basis as the first proposition that there was a common law dedication, namely that the public has driven through this driveway for more than twenty years, going from one street to another without any business at the station, and therefore there is a prescriptive right to its use. We are unable to find that this use has been adverse and under a claim of right. Such use by the public of railroad property is considered permissive and not adverse. *New York Central R. Co. v. Arthelia,* 190 Misc. 555, 74 N. Y. S. 2d 507. While it is true that the chief of the special police force of the Railroad said that the Railroad tried to discourage the use of the driveway by people other than station patrons, he said that was done to keep from congesting traffic in the driveway. There is nothing to show that anybody has ever been stopped, or any arrest has ever been made, and it seems perfectly apparent under the circumstances that there might be a tacit permission for people to go through, provided they do not interfere with the invited traffic having business wtih the station. User, to establish prescription must be adverse and not by license. *Easter v. Overlea Land Co.,* 129 Md. 627, 633, 99 A. 893. To translate such permitted use into adverse and hostile use, so as to take away tacitly the Railroad's property by prescription would be to make a mountain out of a molehill. Our conclusion, therefore,

is that the driveway is not a public street, but is the private property of the Railroad Company.

Appellants, however, as we have stated, argue that their case does not depend upon the driveway being public. They say that a railroad is a common carrier, has a duty to provide facilities for ingress and egress from its station, and it cannot, without discrimination, favor the use of those facilities by one taxicab company in preference to another. They base this contention both upon the common law and upon the statutes.

An early case on the subject was decided by the Supreme Judicial Court of Massachusetts in 1888. That is *Old Colony R. Co. v. Tripp*, 147 Mass. 35, 17 N. E. 89. In that case, the railroad company made a contract with a firm owning job wagons to carry all baggage and merchandise brought by passengers to the station in the city of Brockton, and notified other proprietors of job wagons not to come on its premises for the purpose of soliciting baggage, but allowed them to come on the station to deliver baggage and to take away baggage for which there might have been previous orders. Tripp continued to come upon the premises and solicit baggage, whereupon he was sued for trespass and the railroad got a verdict with nominal damages. The court said: "The station was a passenger station. Passengers taking and leaving the cars at the station, and persons setting down passengers or delivering merchandise or baggage for transportation from the station, or taking up passengers or receiving merchandise that had been transported to the station, had a right to use the station buildings and grounds, superior to the right of the plaintiff to exclusive occupancy. All such persons had business with the plaintiff which it was bound to attend to in the place and manner which it had provided for all who had like business with it. The defendant was allowed to use the depot for any business that he had with the plaintiff. But he had no business to transact with the plaintiff. He had no merchandise or baggage to deliver to the plaintiff, or to receive from it. His

purpose was to use the depot as a place for soliciting contracts with incoming passengers for the transportation of their baggage. The railroad company may be under obligation to the passenger to see that he has reasonable facilities for procuring transportation for himself and his baggage from the station, when his transit ends. What conveniences shall be furnished to passengers within the station for that purpose is a matter wholly between them and the company. The defendant is a stranger both to the plaintiff and to its passengers, and can claim no rights against the plaintiff to the use of its station, either in his own right or in the right of passengers. The fact that he is willing to assume relations with any passenger which will give him relations with the plaintiff which will involve the right to use the depot, does not establish such relations or such right; and the right of passengers to be solicited by drivers of hacks and job-wagons is not such as to give to all such drivers a right to occupy the platforms and depots of railroads." There was a statute which provided for equal terms and facilities to all persons or companies, but the court construed that not to prescribe who had the right to use the depot, but to provide that all who had the right to use it must be furnished with equal conveniences, and said the statute applied only to the relations of railroads as common carriers and their patrons. The court concluded by saying: "We have not been referred to any decision or *dictum* in England or in this country that a common carrier of passengers and their baggage to and from a railroad station has any right, without the consent of the railroad company, to use the grounds, buildings, and platforms of the station for the purpose of soliciting the patronage of passengers, or that a regulation of the company which allows such use by partciular persons, and denies it to others, violates any right of the latter."

There is an annotation in 15 *American Law Reports,* beginning at page 356, which discusses all the cases on the subject decided up to that time, which was in

1920. The annotation states, and this is clearly borne out by the facts, that the decided weight of authority is to the effect that a railroad company may, so long as it thereby affords reasonable accomodation to the public, grant to one company or person the exclusive privilege of entering its station and depot grounds for the purpose of soliciting patronage from passengers. The jurisdictions so holding, with numerous cases in each, are the Federal courts, including the Supreme Court of the United States, Colorado, Connecticut, Georgia, Kansas, Massachusetts, Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New York, Ohio, Oregon, Pennsylvania, Rhode Island, Texas, Utah, Virginia, West Virginia, England, and Canada. On the other hand, the courts in a few jurisdictions have denied the right, and the cases in those jurisdictions are the ones relied on by appellant. These jurisdictions are Illinois, Indiana, Kentucky, Michigan (an early case in 1869, since admitted by the Michigan court to be not in harmony with the weight of authority), Mississippi, Missouri (an early case in 1890, since apparently discredited), Montana, and Pennsylvania (which seems to have held both ways at different times). Since the annotation, there have been a number of later cases, all of which seem to have followed the majority rule. One of the latest of these is *Demeter v. Annenson,* 1947, 80 Cal. App. 2d 48, 180 P. 2d 998. In the opinion in that case are listed three more states following the majority, Alabama, Florida and Iowa, and another, Louisiana, by *dicta.* California in that case held the same way. For us to attempt to even list all of the cases, without attempting to quote from them, would make this opinion, necessarily lengthy on account of the numerous points raised, a treatise of the law, rather than a decision of an actual question presented. There are, however, a few cases we should discuss.

In 1905, the Supreme Court of the United States had before it the case of *Donovan v. Pennsylvania Company,* 199 U. S. 279, 26 S. Ct. 91, 50 L. Ed. 192. This case

had to do with the Union Passenger Station in Chicago, which was owned by the Pennsylvania Company. This station was used by five railroad companies, and, at that time, the average number of passengers arriving and departing was over 30,000 each day. The company had made an arrangement in 1894 with one particular hackman to furnish carriage and cab service to passengers arriving at its station, and had given him a carriage stand on the station property. That arrangement was terminated in 1902, and a similar arrangement was made with the Parmelee Transfer Company. Certain hack drivers, including Donovan, gathered on the sidewalk in front of the station, entered the station without the company's consent, and solicited incoming passengers and baggage for their vehicles. The railroad filed a bill to enjoin these defendants from so acting. There were two questions involved, the first of which was whether the company, having made an arrangement with Parmelee to furnish all vehicles necessary for the accomodation of passengers, could legally exclude from its station and grounds all hackmen or expressmen coming there for the *purpose only of soliciting the custom and patronage of passengers.* The second question, with which we are not here concerned, was the use of the sidewalk and street in front of the station. The court said that while the railroad's property must be devoted primarily to public use to the extent necessary for the objects of a railway, it could establish such reasonable rules with respect to its use consistent with the ends for which it was created, and not inconsistent with public regulations legally established for the conduct of its business. The court said: "It is required, under all circumstances, to do what may be reasonably necessary and suitable for the accommodation of passengers and shippers. But it is under no obligation to refrain from using its property to the best advantage of the public and of itself. It is not bound to so use its property that others, having no business with it, may make profit to themselves. Its property is to be deemed, in every

legal sense, private property as between it and those of the general public who have no occasion to use it for purposes of transportation." The court applied these principles to the case before it, and held it was the duty of the company to see that its passengers were not annoyed, disturbed, or obstructed in the use of its station house or its grounds. It said: "It was to that end—primarily as we may assume from record—that the Pennsylvania Company made an arrangement with a single company to supply all vehicles necessary for passengers. We cannot say that that arrangement was either unnecessary, unreasonable or arbitrary; on the contrary, it is easy to see how, in a great city and in a constantly crowded railway station, such an arrangement might promote the comfort and convenience of passengers arriving and departing, as well as the efficient conduct of the company's business. The record does not show that the arrangement referred to was inadequate for the accommodation of passengers. *But if inadequate, or if the Transfer Company was allowed to charge exorbitant prices, it was for passengers to complain of neglect of duty by the railroad company and for the constituted authorities to take steps to compel the company to perform its public functions with due regard to the rights of passengers. The question of any failure of the company to properly care for the convenience of passengers was not one that, in any legal aspect, concerned the defendants as licensed hackmen and cabmen. It was not for them to vindicate the rights of passengers.*" (Emphasis supplied.) The defendants suggested that they were entitled to the same rights as were accorded by special arrangement to Parmelee. The court said as to this contention: " The railroad company was not bound to accord this particular privilege to the defendants simply because it had accorded a like privilege to the Parmelee Transfer Company; for it had no contractual relations with the defendants, and owed them as hackmen no duty to aid them in their special calling. The defendants did not have or profess

to have any business of their own with the company. In meeting their obligations to the public, whatever the nature of those obligations, the defendants could use any property owned by them, but they could not, of right, use the property of others against their consent." And further: "It is true that by its arrangement with the railroad company the Parmelee Company was given an opportunity to control, to a great extent, the business of carrying passengers from the Union Passenger Station to other railway stations and to hotels or private houses in Chicago. But in a real, substantial, legal sense, that arrangement cannot be regarded as a monopoly in the odious sense of that word, nor does it involve an improper use by the railroad company of its property. That arrangement is to be deemed, not unreasonably, a means devised for the convenience of passengers and of the railroad company, and as involving such use by the company of its property as is consistent with the proper performance of its public duties and its ownership of the property in question. If the company by such use of its property also derived pecuniary profit for itself, that was a matter of no concern to the defendants and gave them no ground of complaint." The court further said that the State did not undertake by any statute to compel the railroad company to share the use of its grounds with hackmen and cabmen seeking to use them only to solicit custom for themselves. "Whether such a statute would be valid, we need not now consider or determine."

The Supreme Court has had two other important cases bearing on this subject, both decided in 1928, long after the *American Law Reports* annotation. These cases are reported in 276 U. S., the first being *Delaware, Lackawanna & Western Railroad Co., v. Town of Morristown,* beginning at page 182. In that case, the town of Morristown had passed an ordinance establishing a public hackstand on a driveway on the station grounds of the railroad. The railroad brought suit to enjoin the town and sixteen operators of taxicabs from enforcing

the provisions of that ordinance. The railroad had made an agreement with one particular taxicab owner to furnish adequate service and to solicit business in the station, to have a stand and facilities in the station, and to park his vehicles upon a specified space in the driveway. The claim made in the suit was that the enforcement of the ordinance would take the railroad's property without due process of law. The court said: "While petitioner owed its passengers the duty of providing a suitable way for them to reach and leave its station, it was not bound to allow cabmen or others to enter upon or use any part of its buildings or grounds to wait for fares or to solicit patronage", citing Donovan v. Pennsylvania So., supra. The court also said: "The police power may be and frequently it is exerted to effect a purpose or consummate an enterprise in the public interest that requires the taking of private property; but, whatever the purpose or the means employed to accomplish it, the owner is entitled to compensation for what is taken from him. The railroad grounds, station, platforms, driveways, etc., are used by the petitioner for the purposes of its business as a common carrier; and, while that business is subject to regulation in the public interest, the property used belongs to petitioner. The State may not require it to be used in that business, or take it for another public use, without just compensation, for that would contravene the due process clause of the Fourteenth Amendment", citing cases, and further: "As against those not using it for the purpose of transportation, petitioner's railroad is private property in every legal sense. The driveway in question is owned and held by petitioner in the same right and stands on the same footing as its other facilities. Its primary purpose is to provide means of ingress and egress for patrons and others having business with the petitioner." And again: "There was no duty upon petitioner to accord to other taxicabmen the use of its lands simply because it had granted Welsh the privileges specified in its contract with him. Petitioner is not bound to

permit persons having no business with it to enter its trains, stations or grounds to solicit trade or patronage for themselves; they have no right to use its property to carry on their own business. Petitioner had no contract relations with taxicabmen other than Welsh and owed them no duty because they did not have any business with it." There was an opinion by Justice Brandeis, concurred in by Justice Holmes, which agreed in part with the decision, but thought the decree as granted was to broad.

In the other case, decided also in 1928, which is *Black and White Taxicab & Transfer Co. v. Brown and Yellow Taxicab & Transfer Co.,* 276 U. S. 518, 48 S. Ct. 404, 72 L. Ed. 681, the opinion was written by Justice Butler, who had also written the opinion in the *Del. L. & W. R. Co. v. Morristown* case. There was a dissenting opinion in that case by Justice Holmes, Brandeis and Stone which will be discussed later. The facts were that the Louisville and Nashville Railroad Company, a Kentucky corporation, made a contract with the Brown and Yellow Taxicab Company, granting it the exclusive privilege of going upon its trains and into its depot and premises at Bowling Green, Kentucky, to solicit transportation of baggage and passengers. The taxicab company was assigned a plot of ground for its use for a consideration, and it agreed to render certain service. The Kentucky court had held in some previous litigation that such a contract was invalid. *McConnell v. Pedigo,* 92 Ky. 465, 18 S. W. 15. *Palmer Transfer Co. v. Anderson,* 131 Ky. 217, 115 S. W. 182, 19 L. R. A., N. S., 756. The Brown and Yellow Taxicab Company, which had been a Kentucky corporation, then incorporated as a Tennessee corporation, brought its action in the United States Court for that district on the basis of diverse citizenship, and asked the court to enjoin the railroad from allowing the Black and White Taxicab Company to enter on its premises in violation of its contract with it. The Black and White Taxicab Company was also made a party. A decree was entered

in favor of the Brown and Yellow Taxicab Company, the railroad company did not take any further action, but the Black and White Taxicab Company did, and eventually the case came to the Supreme Court where the decree was affirmed. The opinion cited a long list of cases from other states which, it said, quite generally construed the common law in accordance with *Donovan v. Pennsylvania Co., supra.* The court held that the decision of the Kentucky Court of Appeals was contrary to the common law as generally understood and applied, and that, following the old case of *Swift v. Tyson,* 16 Pet. 1, 10 L. Ed. 865, it did not have to adopt the Kentucky common law, but could apply what it thought was the proper interpretation of such law. This was the point on which the dissenting opinion was written by Justice Holmes.

It is interesting, and the appellants in the case before us think it important, as we shall hereafter explain, to note that Justice Holmes' opinion was eventually adopted by the Supreme Court in the epoch-making case of *Erie Railroad Co. v. Tompkins,* 304 U. S. 64, 58 S. Ct. 817, 82 L. Ed. 1188, which overruled *Swift v. Tyson, supra,* and referred approvingly to the dissent of Justice Holmes in *Black and White Taxicab Co. v. Brown and Yellow Taxicab Co.* Justice Holmes said in this case, with respect to the common law: "Books written about any branch of the common law treat it as a unit, cite cases from this Court, from the Circuit Courts of Appeals, from the State Courts, from England and the Colonies of England indiscriminately, and criticise them as right or wrong according to the writer's notions of a single theory. It is very hard to resist the impression that there is one august *corpus,* to understand which clearly is the only task of any Court concerned. If there were such a transcendental body of law outside of any particular State but obligatory within it unless and until changed by statute, the Courts of the United States might be right in using their independent judgment as to what it was. But there is no such body of law. The fallacy

and illusion that I think exist consist in supposing that there is this outside thing to be found. Law is a word used with different meanings, but law in the sense in which courts speak of it today does not exist without some definite authority behind it. The common law so far as it is enforced in a State, whether called common law or not, is not the common law generally but the law of that State existing by the authority of that State without regard to what it may have been in England or anywhere else. It may be adopted by statute in place of another system previously in force. *Boquillas Cattle Co. v. Curtis,* 213 U. S. 339, 345, 29 S. Ct. 493, 53 L. Ed. 822. But a general adoption of it does not prevent the State Courts from refusing to follow the English decisions upon "a matter where the local conditions are different. *Wear v. Kansas,* 245 U. S. 154, 156, 157, 38 S. Ct. 55, 62 L. Ed. 214. It may be changed by statute, (*Baltimore & Ohio R. R. Co. v. Baugh,* 149 U. S. 368, 378, 13 S. Ct. 914, 37 L. Ed. 772), as is done every day. It may be departed from deliberately by judicial decisions, as with regard to water rights, in States where the common law generally prevails. Louisiana is a living proof that it need not be adopted at all. (I do not know whether under the prevailing doctrine we should regard ourselves as authorities upon the general law of Louisiana superior to those trained in the system.) Whether and how far and in what sense a rule shall be adopted whether called common law or Kentucky law is for the State alone to decide."

Appellants contend that following *Donovan v. Pennsylvania Co., supra,* and *Black and White Taxicab Co. v. Brown and Yellow Taxicab Co., supra,* the state courts hesitated to establish a common law on the subject involved in this case which would be contrary to that of the United States courts, because they realized that by the use of diverse citizenship, such a case could get into the Federal courts and a different rule would be applied. They say that since the decision in *Erie Railroad Co. v. Tompkins, supra,* that situation does not exist, and there-

fore any state is free to decide its own common law, and the Federal courts will follow it. This last statement is undoubtedly true, but it may be doubted whether the state courts necessarily followed the Supreme Court for the reason given. Before the Supreme Court decided the question, the Massachusetts case of *Old Colony R. Co. v. Tripp, supra,* was decided, and there is a long list of cases cited by Justice Butler in *Black and White Taxicab Co. v. Brown and Yellow Taxicab Co., supra,* from state courts in other states, all of which had passed upon the question before it reached the Supreme Court in that case. It may also be noted that no case in a state court has apparently held to the contrary since *Erie R. Co. v. Tompkins, supra,* which was decided in 1938. On the other hand, the California case of *Demeter v. Annenson, supra,* decided in 1947, reviews the entire subject and follows the majority view. In the last mentioned case, the same contention was made as the appellants make here, that the Supreme Court cases on the common law can no longer be considered valid precedents. The California court said: "It is undeniably true that, insofar as the two cited cases purport to state the federal common law on the subject, they have been overruled by the *Erie Railroad Company case.* But this factor does not render them any less potent as argumentative authorities. The reasoning in such opinions is just as sound as it was prior to the decision in the *Tompkins'* case. *The rationale of such opinions may properly be considered by this court in determining which of two opposing policies this state should adopt."* (Emphasis supplied.)

We have frequently held that it is our duty to determine the common law as it exists in this State (*State v. Buchanan,* 5 H & J. 317. *Gilbert v. Findlay College,* 195 Md. 508, 74 A. 2d 36), and we have not always followed the view taken by the majority of the other states. *Mahnke v. Moore,* 197 Md. 61, 77 A. 2d 923. *Damasiewicz v. Gorsuch,* 197 Md. 417, 79 A. 2d 550. Yet, while we are under no obligation to follow the majority view,

unless we think it better reasoned and sound, nevertheless, we are also under no obligation to try to expound a view which is contrary to that of the majority of the courts which have passed upon the question. In such a case as this, it is important, and manifestly our duty, to examine carefully the reasons underlying the different approaches to the questions involved, and to determine which is correct.

The minority view which the appellants desire us to adopt is perhaps as well expressed as anywhere in the early Kentucky case of *McConnell v. Pedigo,* 92 Ky. 465, 18 S. W. 15. In that case, the Louisville and Nashville Railroad Company had agreed to give McConnell the exclusive privilege of standing hacks at the platform of its depot in Glasgow. This privilege was conferred to the exclusion of other hacks and vehicles, and Pedigo and Hays undertook to transport passengers to and from the depot, and claimed the right to stand their hacks on the depot grounds. A preliminary injunction was granted enjoining them from interfering with the rights of McConnell, but it was dissolved, and then McConnell took the case to the Court of Appeals. The court said that such a contract prevented competition, and made such a discrimination as was unreasonable and detrimental to the public, and that the company had no right to create, either by the provisions of its charter, or for the reason that it is the owner of the property on which the depot stands, an inconvenience to the passengers and the public. That case was interpreted and followed in the later case of *Palmer Transfer Co. v. Anderson,* 131 Ky. 217, 115 S. W. 182, 183, 19 L. R. A., N. S., 756, in the following language: "It was here held that a regulation of a railroad that discriminates by driving from its depot those who are engaged in a public employment and whose duty it is to provide for their guests and the traveling public, resulting in a monopoly of the particular business, is unauthorized by the charter of a railroad company, and in palpable violation of the rights of others. While it may be admitted that the English rule and the

rule of several other states is different from that announced above (*Barker v. Midland Railway Co.*, 86 English Common-Law Reports, 46; *Old Colony Railroad Co. v. Tripp*, 147 Mass. 35, 17 N. E. 89, 9 Am. St. Rep. 661; *Hedding v. Gallagher*, 72 N. H. 377, 57 Atl. 225, 64 L. R. A. 811), yet the courts of several states hold to the view adopted by this court (*Montana Union Ry. Co. v. Langlois*, 9 Mont. 419, 24 Pac. 209, 8 L. R. A. 753, 18 Am. St. Rep. 745; *Kalamazoo Cab & Bus Co. v. Sootsma*, 84 Mich. 194, 47 N. W. 667, 10 L. R. A. 819, 22 Am. St. Pep. 693), and in the recent case of *Indianapolis Railway Co. v. Dohn*, 153 Ind. 10, 53 N. E. 937, 45 L. R. A. 427, 74 Am. St. Rep. 274, the case of *McConnell v. Pedigo & Hays, supra,* was cited with approval. That being the case, we see no reason for changing the rule announced by this court." And further: "There is, in effect, no difference between giving a transfer company the exclusive right to occupy the depot grounds and the right to occupy that portion thereof which necessarily results in its securing by far the larger share of the business. We therefore conclude that appellant's contracts, operating as they do to give it a practical monopoly, are null and void, and that appellant has no right to occupy the space in question to the exclusion of appellee and other hackmen."

This contention is answered in a case in the Supreme Court of Missouri, *Canary Taxicab Co. v. Terminal Ry. Ass'n of St. Louis*, 316 Mo. 709, 294 S. W. 88, 93, where a similar contract had been made by the Terminal Railway Association for the union station in St. Louis. In that case, the court, after citing a long list of cases which followed the majority view, discussed the question of discrimination, and said, in speaking of the duty of a common carrier not to discriminate or give preferences: "* * * and it seems reasonably clear that the individuals, companies, and corporations who are sought by these constitutional and statutory provisions to be protected against discrimination are only those who have a right to demand and receive the particular facility or service

from the railroad company in its capacity as a common carrier. Respondent is not such a person, and the Concourse it seeks to use is not such a facility."

Interstate commerce is generally regarded as ended by the delivery of a passenger to a railroad station (*U. S. v. Yellow Cab Co.*, 1947, 332 U. S. 218, 231-232, 67 S. Ct. 1560, 91 L. Ed. 2010, and the railroad has no duty to perform beyond such delivery, except to provide safe facilities for outgoing and incoming passengers. "The railroad is under no obligation to transport passengers or baggage from its station * * *. *The contract does not relate to the railroad company's business as a common carrier.*" (Emphasis supplied.) *B. & W. Taxi Co. v. B. & Y. Taxi Co., supra,* 276 U. S. at p. 526, 48 S. Ct. at page 406. The question of inadequate facilities is not one that can be raised by appellants in this case, but is a matter for the passengers themselves. *Donovan v. Pennsylvania Co., supra.* The appellants have no right to go upon the railroad property, or the railroad driveway, except at the behest of passengers who are going to the station, or those at the station who have called them for the purpose of transporting them away. That right is not denied them by the Railroad. Otherwise, we do not think the law prohibits a railroad from permitting a company with which it has contracted, to occupy a reserved portion of its station, or to have the exclusive privilege of soliciting incoming passengers. For appellants to have that right would be to deprive the Railroad of the use of its own property without compensation, and we think it cannot be sustained, either upon the basis of the common law, or of general public policy.

Appellants, however, do not rest upon the common law or public policy. They contend that the Legislature has, by the enactment of Section 376 of Article 23 of the Code, required every common carrier to afford all reasonable, proper and equal facilities for the interchange of passengers between the lines operated and controlled by it and the lines of every other common carrier, and

that no common carrier shall in any manner discriminate in respect to any service between two or more common carriers. They state that by Article 23, Section 361, taxicabs are by statute declared to be common carriers, and, therefore, they contend the Maryland statute operates to prevent the Railroad from discriminating between taxicab companies.

Putting to one side the question whether or not the Legislature could validly require the Railroad to open its driveway equally to all taxicabs for all purposes, which we do not decide, see *Swann v. Mayor & City Council*, 132 Md. 256, 103 A. 441, it is apparent that the Legislature has done no such thing. Section 376, when passed by the Act of 1910, Chapter 180, was clearly intended to cover railroads and had no connection whatever with taxicabs. Classification of taxicabs as common carriers for the purpose of giving the Public Service Commission jurisdiction over them does not, in our opinion, give them the rights of connecting railroads. Unless a specific statement to that effect is made by the Legislature, we are unwilling to extend the meaning of Section 361 to that extent. Furthermore, in the statute itself is a provision that it shall not be construed to require a common carrier to permit or to allow any other common carrier to use its tracks or terminal facilities. The appellants contend that this court has already decided that the Legislature can impose upon railroad companies duties in excess of their common law obligations *Public Service Commission v. Northern Central Ry. Co.*, 122 Md. 355, 90 A. 105, and that the exception in the statute as to terminals does not operate to allow discrimination in the use of terminal facilities. *Pennsylvania Co. v. U. S.* 236 U. S. 351, 35 S. Ct. 370, 59 L. Ed. 616. We do not have to decide these questions because we hold that the Legislature has not attempted to pass any provisions which cover the situation in the case before us.

Another point made by appellant is the ruling of the chancellor that evidence to prove poor and inadequate service was irrelevant. We think this is covered by the

statement in *Donovan v. Pennsylvania Co., supra,* that adequate service is not a matter which concerns the appellants, and that they do not stand in the place of passengers in this respect.

Appellants further contend that Ordinance No. 201, which prohibits the Police Commissioner from granting an exclusive franchise, and which was construed in *G. I. Veterans' Ass'n v. Yellow Cab Co., supra,* is applicable in some way. It is clear, however, that the Police Commissioner has not granted any franchise whatever to anyone to stand vehicles in the station drive. The Police Commissioner does exercise authority over the drive to make arrests, and for violation of ordinary taxicab rules, but that is merely in the exercise of his ordinary police duties, and cannot in any sense be held to be a designation of the portion of the drive assigned by the Railroad to the Yellow Cab Company as an exclusive franchise. His recognition of the restricted lane, and his acquiescence in the action of the Railroad police in keeping it restricted, are merely the recognition by a public official of the right of the Railroad to determine what shall be done on its own property and by its own employees, provided no violation of law takes place.

We can reach no conclusion other than that the contract with the Yellow Cab Company is not in violation of the common law of Maryland, nor of any statutes passed by the Legislature, nor of any ordinance of the Mayor and City Council. It is an exercise by the Railroad of its rights to deal with its own property, the appellants have no right to use that property in their business, and if inadequate facilities are thus provided for r ssengers, it is not within their province to complain. Th ecree, therefore, will be affirmed.

*Decree affirmed with costs.*