**LAWRENCE HODGE and MARIA HODGE, Plaintiffs**

**GOVERNMENT OF THE VIRGIN ISLANDS, Intervenor**
**v.**
**BLUEBEARD'S CASTLE, INC., Defendant**

Case No. ST-97-CV-925

Superior Court of the Virgin Islands

Division of St. Thomas and St. John

April 16, 2012

DENISE FRANCOIS, ESQ., Hodge & Francois, St. Thomas, USVI, *Attorney for Plaintiffs*.

GREGORY HODGES, ESQ., Dudley, Topper & Feuerzeig, LLP, St. Thomas, USVI, *Attorney for Defendant*.

DENISE GEORGE COUNTS, ESQ., Department of Justice, St. Thomas, USVI, *Attorney for Intervenor Government*.

DUNSTON, *Judge*

## MEMORANDUM OPINION

(April 16, 2012)

This matter comes before the Court on remand from the Appellate Division of the District Court of the Virgin Islands. For the following

reasons, the Court finds that Plaintiffs and the Government have not carried their burden of proof establishing that the disputed roadway is a public road, and Plaintiffs also have not established that they have acquired access to the roadway via prescription.

## FACTUAL AND PROCEDURAL HISTORY

At the center of this dispute is a road that leads to hotel property of Bluebeard's Castle, Inc. ("BCI") from the west and connects to a parking lot situated near the hotel's lower level buildings. The road has been variously identified as the Bluebeard's Castle entrance road, Vyil Fredericksberg, Road to Frederiksberg, and Frederiksberg Gade. Because the evidence[1] indicates that Frederiksberg Gade or Road is a distinct road that intersects with the western end of the disputed roadway, the road in dispute will be termed the "entrance road" in this Opinion for the sake of clarity. The entire disputed roadway that Plaintiffs and the Government assert is public consists of the entrance road, the middle aisle of the hotel's parking lot, and a second road, identified as the exit road[2] from Bluebeard's Castle, which extends from the eastern portion of the parking lot to Beltjen Road.

The exact origins of the entrance road, parking lot, and exit road are unclear. Although BCI advertises that "Bluebeard's Castle is an historic property dating back to the 1600's,"[3] the parties have only provided evidence as far back as 1912[4] with respect to the origin of the entrance road and as far back as 1937[5] for the exit road. At trial, Brian Mosley, a local land surveyor, provided expert testimony that the entrance road is located nearly entirely within the boundaries of BCI's hotel property.[6] The parties do not dispute that the parking lot and exit road are located within BCI's property boundaries.

---

[1] P.W. ·Drawing No. A3-11-T32 (Exhibit 3), P.W. Drawing No. A3-30-T37 (Exhibit 4), and P.W. Drawing No. A9-296-782 (Exhibit 7).

[2] The exit road has also been referred to as "the cable tv road" because it passes by a cable tv building.

[3] See http://www.bluebeards-castle.com/.

[4] Plaintiff's Exhibit 6.

[5] P.W. Drawing No. A3-30-T37 (Exhibit 4).

[6] Mosely testimony, at page 250.

Plaintiffs own Parcel 39c Estate Taarnebjerg, which partially abuts the entrance road. Previous to Plaintiffs' purchase of Parcels 39c,[7] 39a, and 40b Estate Taarnebjerg from the West Indian Company, Ltd. ("WICO"), WICO maintained a garage and a house on Parcel 39c called "Villa Iota." There is some evidence that Villa Iota was occupied for unspecified periods of time by unidentified employees of WICO between the 1950s and 1981 when Villa Iota burned down. During this time, the entrance road was used to access Parcel 39c. After Plaintiffs purchased the three parcels on December 11, 1985, Plaintiff Lawrence Hodge used the entrance road to access a shed located on Parcel 39c. Plaintiff Maria Hodge testified that she used the roadway "very rarely."[8]

In the early 1990s, two guests of BCI's hotel were raped on the premises. In 1994, BCI constructed a gate near the western mouth of the entrance road as a security measure. The gate was originally closed during the night hours and then continuously closed sometime before 1997. In 1997, BCI placed a chain across the eastern portion of the entrance road such that Plaintiffs were thereafter prevented from accessing their shed on Parcel 39c by means of the entrance road. On November 19, 1997, Plaintiffs filed an eleven count action against BCI. The Government of the Virgin Islands filed a motion to intervene on October 10, 2001, and a complaint on January 28, 2002, seeking a declaration that the entrance road, the middle aisle of the parking lot, and the exit road were, in combination, a public road. The parties agreed that the case would be submitted to a jury for an advisory opinion, and on June 3, 2002, the jury found, by a preponderance of the evidence, that the disputed roadway was a public road. On June 17, 2002, the trial court issued a memorandum opinion and judgment finding that the roadway was a public road. On July 18, 2002, the trial court denied Plaintiffs' motion for new trial on the issue of damages. *See Lawrence Hodge v. Bluebeard's Castle, Inc.*, No. Civ. 925/1997, 2002 V.I. LEXIS 23 (Terr. VI. 2002).

On appeal, the District Court of the Virgin Islands determined that although Plaintiffs had alleged that (1) the disputed roadway was a public road and that (2) they had an easement by prescription over the roadway,

---

[7] Parcel 39c's northern boundary partially abuts the entrance road and its southern boundary is the northern boundary of Parcel 39a Estate Taarnebjerg. Beltjen Road serves as Parcel 39a's southern boundary.

[8] Maria Hodge testimony, at page 266.

it was uncertain whether the trial court had held them to their burden of proof for either theory. *See Bluebeard's Castle, Inc. v. Hodge*, 51 V.I. 672, 690 (D.V.I. 2009). In fact, the District Court commented: "absent from the trial court's opinion is a clear articulation of an application of the legal standard governing the establishment of a public road." *Id.*, at 691. Accordingly, the District Court vacated the trial court's judgment in favor of Plaintiffs and remanded the case to this Court for further proceedings. BCI subsequently appealed the District Court's ruling, but the Third Circuit Court of Appeals dismissed the appeal for lack of jurisdiction.

## ANALYSIS

On remand, the Court will evaluate Plaintiffs'[9] theories in support of their purported right to access the disputed roadway as instructed by the District Court. Before doing so, the Court notes that it will rely on Brian Mosely's expert opinion that the entrance road is located within the boundaries of BCI's property, except for the portion of the entrance road that intersects with Fredericksberg Road. Mosely arrived at his conclusions by examining several survey maps of the BCI property and comparing the maps with the metes and bounds description in a 1933 deed of the BCI property. At trial, Mosely provided a step-by-step analysis of his conclusions for the jury on the record. Mosely acknowledged that a survey conducted by Charles Hamilton indicated that a slightly larger area of the entrance road was outside BCI's property boundaries as compared to his own analysis. However, Hamilton did not provide expert testimony in this case, and there is no definitive evidence refuting Mosely's analysis and credible conclusions.

### Public road by dedication

In Count V of Plaintiffs' Complaint, Plaintiffs contend that the entrance and exit roads and parking lot at BCI's hotel were dedicated to the public. Pursuant to 20 V.I.C. § 3a(a), the "Commissioner of Public Works is authorized to receive offers to dedicate private roads to public use throughout the Virgin Islands." The Legislature must also approve the dedication of property. 20 V.I.C. § 3a(b). Here, there is no evidence that

---

[9] In its complaint, the Government also contends that the disputed roadway is public but does not specify a legal theory in support of the assertion.

BCI or anyone else formally dedicated the road to the Government or that the Legislature approved the dedication.

■ Property rights may also be dedicated by implication, under which an offer to dedicate the property and public acceptance of the offer are inferred from the circumstances. Under the Third Restatement, a public acceptance may be demonstrated "by [long-continued] public use of the designated areas or by acts of maintenance or control by a governmental unit." RESTATEMENT (THIRD) OF PROPERTY-SERVITUDES § 2.18. *See also Wojahn v. Johnson*, 297 N.W.2d 298, 307 (Minn. 1980) ("both intent and acceptance can be inferred from longstanding acquiescence in the right of the public to use the road and from acts of public maintenance").

■ Considering that the doctrine of implied dedication deems private property to be public property based on circumstantial evidence and without compensation to the private landowner, indiscriminate use of the doctrine by the courts could deprive a landowner of his or her Fifth Amendment rights. *See U.S. v. 6.45 Acres of Land*, 409 F.3d 139, 145 (3rd Cir. 2005) (the taking of property by the government without "just compensation" is an unconstitutional seizure of property under the Fifth Amendment). Accordingly, the proponent of the doctrine must demonstrate "proof of dedication by clear and convincing evidence . . . This higher standard of proof is demanded since the ownership of property should be granted a high degree of sanctity and respect." *Draper City v. Estate of Bernardo*, 888 P.2d 1097, 1099 (Utah 1995). *See also McAllister v. Sanders*, 937 N.E.2d 378, 383 (Ind. Ct. App. 2010) ("[t]he intention must clearly appear, and the acts and declarations of the owner relied on to establish it must be clear, convincing, and unequivocal"); *Hargrove v. Carlton*, No. M2000-00250-COA-R3-CV, 2001 Tenn. App. LEXIS 88, at *4 (Tenn. Ct. App. 2001) (there must be "clear and convincing evidence that there was an intention on the part of the landowner to dedicate the road to the public, and that the road was either expressly or impliedly accepted by the public"); *Dykes v. Friends of C.C.C. Road*, 283 Va. 306, 720 S.E.2d 537, 541 (Va. 2012) ("[w]hile a dedication may be implied from the acts of the owner, these acts must

66

be unmistakable to show the intention of the landowner to permanently give up his property").[10]

Plaintiffs present the testimony of several individuals who discussed the use of the entrance and exit roads and the parking lot by members of the public. Darlin Brin testified that, between 1942 and 1960, he lived on Taarneberg No. 40, a parcel in close proximity to BCI's property. Brin stated he observed people living in Villa Iota in the 1950s and using a garage on Parcel 39c. Brin also testified about the route that the occupants of Villa Iota would travel to access the garage, stating: "they would drive up the hill, go into the garage, and when leaving, I have seen them exit this way. This road was not a one way at the time."[11] In addition, Raymond DeLugo, an employee of BCI from 1961 and 1983, provided testimony that he also observed the occupants of Villa Iota accessing the garage. When asked whether there was "any other way for the motor vehicles to get into the garage other than the entrance road," DeLugo responded: "that was the only way up the hill."[12]

■ Based on the testimony of Brin and DeLugo, the Court finds that the occupants of Villa Iota would drive the entrance road to access the garage on Parcel 39c. However, there is no evidence establishing the identities of the occupants of Villa Iota or the time period during which each occupant resided at Villa Iota, information which could have been used to demonstrate how often the entrance road was used to access the garage. Assuming, *arguendo*, that Villa Iota was occupied continuously between 1950 and 1981 when the building burned down, and that the entrance road was used to access the garage on the property during that time, this use alone would not establish an implied dedication of the road to the public. Rather, "the proponent of access must show 'various groups of persons have used the land,' rather than 'a limited and definable number of persons.'" *Hanshaw v. Long Valley Road Ass'n*, 116 Cal. App. 4th 471, 11 Cal. Rptr. 3d 357, 366 (Cal. Ct. App. 2004) (citing *Gion v. City of Santa Cruz*, 2 Cal. 3d 29, 84 Cal. Rptr. 162, 465 P.2d 50 (Cal.

---

[10] Considering that the jury, in its advisory capacity, found that the disputed roadway was public only by a preponderance of the evidence, this Court will weigh that decision accordingly.

[11] Brin testimony, at page 66. Brin's testimony suggests that the entrance road, which is currently a one way road, was a two way road as late as 1960.

[12] DeLugo testimony, at page 100.

1970)). *See also Draper City v. Estate of Bernardo*, 888 P.2d 1097, 1099 (Utah 1995) (owners of adjoining property to a road cannot be considered members of the public generally).

██ █ Plaintiffs' other evidence of public use is unavailing. Darlin Brin's testimony[13] that he and neighborhood children played in the roads and that he walked the roads to travel from his house to Charlotte Amalie High School does not establish an easement for vehicular use, which Plaintiffs seek. *See* RESTATEMENT OF PROPERTY § 478, comment d, illustration 3 (1994). In addition, Louis Hughes' testimony that traffic was rerouted to pass over the entrance and exit roads when the Department of Public Works repaired sewer lines near Beltjen Road or when the police redirected traffic over the roads does not establish that the roads were used by the public with any regularity. Similarly, DeLugo's testimony that "anyone trying to beat traffic"[14] would use the hotel's roads and parking lot as a cut-through road does not establish by clear and convincing evidence an intent on the part of BCI or its predecessors to dedicate the entrance and exit roads and middle aisle of the hotel parking lot to the public for a public highway. *See Blank v. Park Lane Center*, 209 Md. 568, 121 A.2d 846, 848 (Md. 1956) (use of a driveway in commercial area "by persons not desiring to shop or to park, but who intended to drive [through] as a matter of convenience or to avoid a traffic light" was insufficient to show offer to dedicate by property owner); *see also Shapiro Bros. v. Jones-Festus Properties*, 205 S.W.3d 270, 277-278 (Mo. Ct. App. 2006) (fact that some members of the general public used parking lot of shopping establishment as a shortcut was insufficient to show an offer to dedicate); *Security Fed. Sav. & Loan Assn. v. C & C Investments*, 448 N.W.2d 83, 87-89 (Minn. Ct. App. 1989) (use of parking lot as a cut through is insufficient to demonstrate an offer to dedicate); *Snow v. Murphy*, 248 Mich. 659, 227 N.W. 544, 545 (Mich. 1929) ("mere permissive use of a private road by the general public, however long continued, will not make it a public highway").

Accordingly, Plaintiffs and the Government have failed to establish by clear and convincing evidence that (1) BCI or its predecessors intended to dedicate the entrance and exit roads and parking lot to the public and (2)

---

[13] Brin testimony, at pages 62 and 64.

[14] DeLugo testimony, at page 98.

that the public demonstrated an acceptance of the dedication by public use of the roads and parking lot.

In addition, Plaintiffs and the Government have provided evidence that the Government maintained the disputed roadway. "An intent to dedicate is inferable when the roadway is repaired and maintained by the public." *Johnson v. City of Selmer*, 1993 Tenn. App. LEXIS 537, at *12 (Tenn. Ct. App. 1993). On the other hand, "merely by permitting public authorities to perform occasional maintenance on a road . . . does not manifest an intention to dedicate the way for public use." *MDC Blackshear, LLC v. Littell*, 273 Ga. 169, 537 S.E.2d 356, 359 (Ga. 2000). *See also McGarry v. Scott*, 134 N.M. 32, 72 P.3d 608, 615 (N.M. 2003) ("[g]enerally, periodic maintenance on an irregular basis of a road will not, by itself, establish implied acceptance of full maintenance responsibility by the county").

Raymond DeLugo testified that when work needed to be done on the entrance road during his tenure as resident manager,[15] he called Public Works to fill potholes and make other repairs. If Public Works would not respond to his requests in a timely fashion, DeLugo would petition officials at Government House until the repairs would be done. DeLugo also testified that Public Works made repairs to the hotel's "parking lot."[16] DeLugo reached out to Public Works to make the repairs because he assumed the entrance road was public.[17] Significantly, however, DeLugo admitted that he never saw any document reflecting that the entrance road was public nor did he specify any other support for his assumption that the entrance road was public.[18] In addition, there is no evidence that DeLugo had the capacity to dedicate BCI property, including the entrance road and parking lot, to the public. *See Kunefke v. Calhoun County*, No. 13-05-006-CV, 2006 Tex. App. LEXIS 4916, at *8 (Tex. App. 2006) (in order to establish a successful dedication, the "person who makes the dedication must have the ability to do so, i.e., the landowner must have

---

[15] The record does not reflect how long DeLugo worked for BCI as a resident manager. DeLugo testified he worked for BCI in various capacities from 1961 to 1983. DeLugo testimony, at page 93. DeLugo also indicated he resided on BCI's hotel property from 1968 until 1983. *Id.*, at page 95.

[16] *Id.*, at page 103.

[17] *Id.*, at page 106.

[18] *Id.*, at page 107.

fee simple title before he can dedicate his property"). Moreover, DeLugo has not specified the extent of the work that was done to the entrance road and parking lot, how often Public Works made repairs, or even a single date when repair work was done. Given the paucity of facts presented, it is unclear whether BCI ownership was aware of any acts committed by DeLugo, whether BCI ownership ratified[19] DeLugo's actions, or whether any ratification of DeLugo's actions could constitute an offer to dedicate BCI property.

David Rice, who worked for BCI between 1995 and 2000 as a general manager and then as the director of operations, testified that the entrance road was in disrepair after Hurricane Marilyn in 1995 and exhibited dangerous cracks.[20] Rice indicated that he did not request the Government to repair the entrance road because the road was private.[21] Rice considered the entrance road to be private through a conversation with John Cavanaugh, formerly a principal owner of BCI.[22] Instead of repairing the entrance road after Hurricane Marilyn, Rice testified that, after consulting with Cavanaugh, he was instrumental in the decision to permanently close the entrance road given the cost to repair the road and BCI's interest to have only one means of ingress and egress to and from the hotel property for security purposes.[23] Rice's testimony suggests that BCI ownership did not exhibit an intent to dedicate the entrance road to the public as a public road.

With respect to the Government's maintenance of the disputed roadway, Leal VanBeverhoudt, who worked for the Department of Public Works, testified that he drove an asphalt machine and paved a portion of the hotel's roads in 1961. Unfortunately, when VanBeverhoudt used a laser pointer to show the jury what portion of the roadway he paved and which portion he did not, neither party took the trouble to preserve a record as to these references. VanBeverhoudt also stated that Public

---

[19] "Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority . . . . A person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents." RESTATEMENT (THIRD) OF AGENCY § 4.01.

[20] Rice testimony, at pages 121 and 130.

[21] *Id.*, at page 132.

[22] *Id.*, at pages 118 and 119.

[23] *Id.*, at pages 120-121 and 131.

Works would make repairs to the disputed roadway in response to BCI's requests for repairs during the 38 years VanBeverhoudt worked for Public Works. However, VanBeverhoudt did not provide any information concerning the other purported repairs. As a result, VanBeverhoudt's anecdotal testimony is inconclusive.

Wayne Callwood, the Commissioner of Public Works at the time of trial, testified that he witnessed work being done on the entrance road by the Government some time between 1988 and 1994, including the placement of signs and some "overlaying."[24] Callwood also indicated the Government had records documenting the extent of the work done on the entrance road and "could have brought [them to trial]."[25] The Court notes that none of these documents were produced before, during, or after trial.

Aldridge Thomas, a field manager for Public Works, testified that he replaced a speed limit sign, a chevron sign,[26] and a one-way sign on unspecified roads in the vicinity of Bluebeard's Castle sometime after Hurricane Hugo in 1989. Thomas testified that Public Works had records showing the work done on the disputed roadway but the records "got messed up."[27] During his testimony, Thomas used a laser pointer to indicate the location of the placement of the signs, but neither party clarified on the record the areas Thomas was pointing to on Plaintiffs' Exhibit 1.[28] Plaintiffs have, however, submitted photographs of the entrance road that indicate the presence of a chevron sign and a speed limit sign on the entrance road.

 The fact that Public Works placed two road signs on the entrance road and made some nonspecific road repair to the entrance road and parking lot does not establish, by clear and convincing evidence, that BCI ownership intended to permanently give the public access to the entrance road and parking lot as a thoroughfare. *See Merritt v. Daiello*, 189 Vt. 647, 10 A.3d 497 (Vt. 2010) (a town's irregular maintenance of a portion of a road was insufficient to establish a public road by dedication); *see also Miller v. Hoskinson*, 189 W. Va. 189, 429 S.E.2d 76, 79 (W.Va. 1993) ("isolated and sporadic instances of public maintenance

---

[24] Callwood testimony, at page 72.

[25] *Id.*

[26] A chevron sign indicates that the road is about to curve.

[27] Thomas testimony, at page 176.

[28] Thomas testimony, at page 171.

do not establish a road as public"). Similarly, the record is devoid of any evidence suggesting Public Works made repairs to the exit road. Accordingly, Plaintiffs and the Government have not carried their burden of proof necessary to establish that BCI dedicated the entrance road, parking lot, and exit road to the public and that the Government accepted the dedication through maintenance of the property.

Finally, the Court evaluates the "official St. Thomas Public Road Map" from the Department of Public Works that was submitted into evidence.[29] The parking lot, entrance, and exit roads appear on the map as solid lines, which is indicative of a public road, according to the map's rubric. However, because there is no evidence suggesting that BCI or its predecessors recorded the map or otherwise recognized and approved the map, the map cannot serve as clear and convincing evidence of the intent of BCI or its predecessors to dedicate the entrance and exit roads and parking lot. *See Hackert v. Edwards*, 22 Conn. Supp. 499, 175 A.2d 381, 382 (Conn. Super. Ct. 1961). The Government of the Virgin Islands "cannot dedicate streets over land that [it] does not own" through the generation of a map. *See City of Camden v. Armstrong Cork Co.*, 210 F. 818, 823 (3d Cir. 1913). Therefore, the location of the entrance and exit roads and parking lot on the map can "answer no purpose except that of location and to notify [the public] that such . . . actual . . . street[s] [lie] in . . . certain position[s] with reference to [BCI's] tract." *Id.*

### Public road by prescription

In Count IX of the Complaint, Plaintiffs allege that the public acquired an easement over the disputed roadway by prescription.

In the Virgin Islands, a party may establish a prescriptive easement by showing a use of property for a period of fifteen years that was (1) adverse to the rights of the property owner, (2) uninterrupted, (3) exclusive, (4) continuous, and (5) under a claim of right. *See* 3 Op. Atty. Gen. 228, 229-230; *see also* 28 V.I.C. § 11. "A road will become a public road by prescription when the public has continually used the road with the knowledge but without permission of the owner, in a manner adverse to the owner's rights, throughout the statutory period." *Fitzpatrick v. Palmer*, 186 Ohio App. 3d 80, 926 N.E.2d 651, 657 (Ohio Ct. App. 2009)

---

[29] PWD file no. 32-D5-02, dated 3/17/94.

72

(quoting *Miller v. W. Carrollton* (Aug. 27, 1991), Montgomery App. No. 12606, 1991 Ohio App. LEXIS 4104 (Ohio Ct. App. 1991)). A claimant must prove all elements of his or her claim of a prescriptive easement by clear and convincing evidence. *McNamara v. Christian*, 26 V.I. 109, 112 (Terr. Ct. 1991).

■ Plaintiffs have not provided clear and convincing evidence showing that the public used the entrance and exit roads and parking lot on a continuous basis. Rather, Plaintiffs' evidence suggests that the public used the disputed roadway occasionally as a cut-through route. In addition, the evidence suggests that BCI permitted the public to use the entrance and exit roads to gain access the hotel and its facilities. DeLugo testified that BCI encouraged the public to use the entrance and exit roads "because [BCI] had a hotel up there and [BCI] wanted people to come up" and use their facilities.[30]

■ In order to establish prescription, however, usage must be adverse and not by license. Although it is plausible that the public's use of the roadway as a cut-through extended beyond the scope of BCI's permission, it is equally plausible that BCI gave tacit permission to the public to use the roads as a cut-through, provided the public did not interfere with the traffic having business at the hotel. *See Association of Independent Taxi Operators v. Yellow Cab Co.*, 198 Md. 181, 82 A.2d 106, 112 (Md.1951) (public had tacit permission to use driveways leading to, and away from, the railroad station). As such, Plaintiffs' failure to provide clear evidence of the frequency with which the public used the roads as a cut-through undermines their ability to show that the public's use of roads was hostile and adverse to BCI's ownership rights. Accordingly, Plaintiffs have not established through clear and convincing evidence that the public acquired an easement over the disputed roadways by prescription.

### Private Prescriptive Easement

In Counts III and VII of Plaintiffs' Complaint, Plaintiffs assert they have acquired a private casement by prescription.

■ As previously stated, an easement by prescription requires a showing of a use that is (1) adverse to the rights of the property owner,

---

[30] DeLugo testimony, Exhibit 7, at page 109.

(2) uninterrupted, (3) exclusive, (4) continuous, and (5) under a claim of right. In addition, the "doctrine of tacking permits a claimant to add his period of possession to that of a previous adverse possessor to establish continuous possession for the statutory period." *Powell v. Mahabir*, 50 V.I. 890, 895 (D.V.I. 2008). A claimant must prove all elements of his or her claim of a prescriptive easement by clear and convincing evidence. *McNamara v. Christian*, 26 V.I. 109, 112 (Terr. Ct. 1991).

Plaintiffs purchased Parcel 39c in 1985 and filed their action in 1997. In 1981, Villa Iota burned down, and there is no evidence showing whether Parcel 39c was occupied, or the entrance road was used, by anyone associated with WICO after Villa Iota burned down in 1981 and prior to Plaintiffs' purchase of the property in 1985. Based on the evidence, Plaintiffs have not met their burden of proof showing that they used the entrance road to access Parcel 39c continuously for a period of fifteen years nor have they established the requirements for tacking. Accordingly, Plaintiffs have failed to establish their claim for a private easement by prescription.[31]

An Order consistent with this Opinion shall follow.

---

[31] The Court notes that Plaintiffs' claim of a private easement by prescription will be dismissed without prejudice so as not to foreclose that claim unknowingly if Plaintiffs choose to refile the claim. At present, Plaintiffs have owned Parcel 39c for a period of time that exceeds the statutory period.