## LAURETTA BASEMAN BOBLITZ v. CHARLES WILLIAM BOBLITZ

[No. 126, September Term, 1982.]

*Decided June 30, 1983.*

The cause was argued before SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ., and W. ALBERT MENCHINE, Associate Judge of the Court of Special Appeals (retired), specially assigned.

*Elena B. Langan* and *Claude L. Callegary* for appellant.

*F. Gray Goudy* for appellee.

MENCHINE, J., delivered the opinion of the Court. DAVIDSON, J., concurs in the result. COUCH and RODOWSKY, JJ., dissent. COUCH, J., filed a dissenting opinion at page 282 *infra,* in which RODOWSKY, J., joins.

Lauretta Baseman Boblitz (hereafter Appellant), separated wife of Charles William Boblitz (hereafter Appellee), instituted suit against him in the Superior Court of Baltimore City. The action, sounding in tort, alleged that on August 26, 1978 Appellant sustained serious, painful and permanent injuries as the result of the negligence of Appellee in the operation of a motor vehicle.

In due course, Appellee filed a Motion for Summary Judgment upon the following facts:

> "The Defendant moves for Summary Judgment on the ground that there is no genuine dispute between the parties as to any material fact and that the Defendant is entitled to judgment as a matter of law and for reason says that the parties hereto were married on March 4, 1979 and are husband and wife, as witness Plaintiff's Answers to Defendant's Interrogatories No. 21, No. 22 and No. 24 filed herein, and that the alleged cause of action herein was extinguished by said marriage under the authority of *Hudson v. Hudson,* 226 Md. 521, 174 A. 2d 339 (1961)."

The answer of the Appellant admitted the recited facts, disputed the conclusion of law, and further alleged that the parties separated on July 7, 1980; had not resumed a marital relationship since that date; and that there was no hope of a reconciliation.

After hearing, the trial judge, as indeed under the circumstances he was required to do in the face of our prior decision in *Hudson, supra,* granted summary judgment to the

Appellee (Defendant below) in an order reading as follows:

"DEFENDANT'S MOTION FOR SUMMARY JUDGMENT GRANTED. *HUDSON V. HUDSON,* 226 Md. 521 (1961), CITED IN *LUSBY V. LUSBY,* 283 Md. 334, 345 (1978) STILL APPEARS TO BE THE LAW IN MARYLAND, AT LEAST UNTIL IT IS ALTERED BY THE COURT OF APPEALS OR THE LEGISLATURE."

Appellant filed a timely appeal asking us to reexamine the interspousal immunity rule that was the basis for decision in *Hudson, supra,* and to declare that rule to be no longer viable in tort cases involving personal injury to a spouse resulting from the negligence of the other spouse.

The interspousal immunity rule, of ancient origin, is a creature of the common law that resulted exclusively from judicial decisions and is thus described by Blackstone:

"By marriage, the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband: under whose wing, protection, and *cover,* she performs everything; and is therefore called in our law-french a *feme-covert, foemina viro co-operta;* is said to be *covert-baron,* or under the protection and influence of her husband, her *baron,* or lord; and her condition during her marriage is called her *coverture.* Upon this principle, of a union of person in husband and wife, depend almost all the legal rights, duties, and disabilities, that either of them acquire by the marriage." Book 1, Ch. 15, p. 442

\* \* \*

"If the wife be injured in her person or her property, she can bring no action for redress without her husband's concurrence, and in his name, as well as her own: neither can she be sued without making the husband a defendant." *Id.,* p. 443

Application of the words *inter*spousal immunity to this ancient rule of law borders on mockery. It would be more aptly called "a rule in derogation of married women." Under it the person and property of a woman upon marriage came under the "protection and influence" of her husband — for good or ill. She became subservient to his will and fitted with a distasteful yoke of servitude and compelled obeisance that was galling at best and crushing at worst.

As women's role in society changed, the burden of this imputation of inferiority became increasingly intolerable and led to an ever increasing storm of protest.

This storm of protest, reaching hurricane proportions in the second half of the Nineteenth Century, caused the Legislatures of the several states to enact "Married Womens Acts."

Maryland's "Married Womens Act," [1] enacted in 1898, now is codified as Article 45, Section 5 of the Annotated Code of Maryland, and reads as follows:

> "*Married women shall have power* to engage in any business, and to contract, whether engaged in business *or not, and to sue upon their* contracts, and also *to sue* for the recovery, security or protection of their property, and *for torts committed against them, as fully as if they were unmarried;* contracts may also be made with them, and they may also be sued separately upon their contracts, whether made before or during marriage, and for wrongs independent of contract committed by them before or during their marriage, as fully as if they were unmarried; and upon judgments recovered against them, execution may be issued as if they were unmarried; nor shall any husband be liable upon any contract made by his wife in her own name and upon her own responsibility, nor for any tort committed sepa-

1. Ch. 457 of Acts of 1898.

rately by her out of his presence, without his participation or sanction." (Emphasis added)

Two years later the General Assembly added what is now Code (1957) Art. 45, Section 20:

"A married woman may contract with her husband and may form a copartnership with her husband or with any other person or persons in the same manner as if she were a feme sole, and upon all such contracts, partnership or otherwise, a married woman may sue and be sued as fully as if she were a feme sole."

The passage of Married Womens Acts in the several states soon produced litigation directed to the question of their meaning and effect.

The decision of the Supreme Court of the United States in *Thompson v. Thompson,* 218 U.S. 611, 54 L. Ed. 1180 (1910) was the bellwether for early decisions interpreting Married Womens Acts.

In *Thompson,* the Supreme Court was called upon to determine whether the District of Columbia Act conferred upon a wife the right to maintain a tort action against her husband.

The District of Columbia statute [2] as incorporated in the *Thompson* opinion (218 U.S. at 615, 54 L. Ed. at 1181-82) read as follows:

"*Married women shall have power* to engage in any business, and to contract, whether engaged in business or not, and to sue separately upon their contracts, and also *to sue separately* for the recovery, security, or protection of their property, and *for torts committed against them, as fully and freely as if they were unmarried;* contracts may also be made with them, and they may also be sued separately upon their contracts, whether made before or during marriage, and for wrongs independent of

---

**2.** A comparison of the quite similar District of Columbia and Maryland Acts will be found in *Lusby v. Lusby,* 283 Md. 334.

contract, committed by them before or during their marriage, as fully as if they were unmarried; and upon judgments recovered against them execution may be issued as if they were unmarried; nor shall any husband be liable upon any contract made by his wife in her own name and upon her own responsibility, nor for any tort committed separately by her out of his presence, without his participation or sanction: Provided, That no married woman shall have power to make any contract as surety or guarantor, or as accommodation drawer, acceptor, maker, or indorser." (Emphasis added)

The Supreme Court said: (at p. 618 of 218 U.S.; p. 1182 of 54 L. Ed.)

"The statute was not intended to give a right of action as against the husband, but to allow the wife, in her own name, to maintain actions of tort which, at common law, must be brought in the joint names of herself and husband.

This construction we think is obvious from a reading of the statute in the light of the purpose sought to be accomplished. It gives a reasonable effect to the terms used, and accomplishes, as we believe, the legislative intent, which is the primary object of all construction of statutes.

It is suggested that the liberal construction insisted for in behalf of the plaintiff in error in this case might well be given, in view of the legislative intent to provide remedies for grievous wrongs to the wife; and an instance is suggested in the wrong to a wife rendered unable to follow the avocation of a seamstress by a cruel assault which might destroy the use of hand or arm; and the justice is suggested of giving a remedy to an artist who might be maimed and suffer great pecuniary damages as the result of injuries inflicted by a brutal husband.

Apart from the consideration that the perpetration of such atrocious wrongs affords adequate

grounds for relief under the statutes of divorce and alimony, this construction would, at the same time, open the doors of the courts to accusations of all sorts of one spouse against the other, and bring into public notice complaints for assault, slander, and libel, and alleged injuries to property of the one or the other, by husband against wife, or wife against husband."

The Court referring further to "alternative remedies" said:

"Nor is the wife left without remedy for such wrongs. She may resort to the criminal courts, which, it is to be presumed, will inflict punishment commensurate with the offense committed. She may sue for divorce or separation and for alimony. The court, in protecting her rights and awarding relief in such cases, may consider, and, so far as possible, redress her wrongs and protect her rights." At p. 619 of 218 U.S.; p. 1183 of 54 L. Ed.

at another point in the opinion the Court stated at page 1182:

"In no act called to our attention has the right of the wife been carried to the extent of opening the courts to complaints of the character of the one here involved." [3]

The available "alternative remedies" suggested by the Court have a hollow ring. The well-being of a disabled wife whose warrant causes the confinement of her husband is surely not advanced thereby. Nor is the disabled widow aided when the death of her spouse ends the alimony the Court suggests "affords adequate grounds for relief."

A dissenting opinion of Justice Harlan in *Thompson*, in which Justices Hughes and Holmes joined, eloquently rejected every premise of the majority, saying at pp. 621-624 of 218 U.S.; pp. 1184-1185 of 54 L. Ed.:

**3.** Since the decision in *Thompson*, courts of last resort in ten states have done so. See Footnote 12 infra.

"In my opinion these statutory provisions, properly construed, embrace such a case as the present one. If the words used by Congress lead to such a result, and if, as suggested, that result be undesirable on grounds of public policy, it is not within the functions of the court to ward off the dangers feared or the evils threatened simply by a judicial construction that will defeat the plainly-expressed will of the legislative department. . . . Now, there is not here, as I think, any room whatever for mere construction, so explicit are the words of Congress. Let us follow the clauses of the statute in their order. The statute enables the married woman to take, as her own, property of any kind, no matter how acquired by her, as well as the avails of her skill, labor, or personal exertions, 'as absolutely *as if she were unmarried.'* It then confers upon married women the power to engage in any business, no matter what, and to enter into contracts, whether engaged in business or not, and to sue separately upon those contracts. If the statute stopped here, there would be ground for holding that it did not authorize this suit. But the statute goes much farther. It proceeds to authorize married women 'also' to sue separately for the recovery, security, or protection of their property; still more, they may sue separately 'for *torts* committed against *them,* as fully and freely *as if they were unmarried.'* No discrimination is made, in either case, between the persons charged with committing the tort. No exception is made in reference to the husband, if he happens to be the party charged with transgressing the rights conferred upon the wife by the statute. In other words, Congress, by these statutory provisions, destroys the unity of the marriage association as it had previously existed. It makes a radical change in the relations of man and wife as those relations were at common law in this District. In respect of business and property, the married

woman is given absolute control; in respect of the recovery, security, and protection of her property, she may sue separately in *tort,* as if she were unmarried; and in respect of herself, that is, of her person, she may sue separately as fully and freely as if she were unmarried, 'for *torts* committed *against her.'* So the statute expressly reads. . . . I cannot believe that [Congress] intended to permit the wife to sue the husband separately, in tort, for the recovery, including damages for the detention, of her property, and at the same time deny her the right to sue him, separately, for a tort committed against her person. . . .

My brethren feel constrained to say that the present case illustrates the attempt, often made, to effect radical changes in the common law by mere construction. On the contrary, the judgment just rendered will have, as I think, the effect to defeat the clearly expressed will of the legislature by a construction of its words that cannot be reconciled with their ordinary meaning.

I dissent from the opinion and judgment of the court, and am authorized to say that Mr. Justice Holmes and Mr. Justice Hughes concur in this dissent."

There is little doubt that early litigation questioning the continuing viability of the interspousal immunity rule were strongly influenced by the decision in *Thompson, supra,* by the Supreme Court of the United States.

The first Maryland decision upon the question, *Furstenburg v. Furstenburg,* 152 Md. 247, 136 A. 534 (1927) cited and relied exclusively upon *Thompson, supra,* as its basis for decision.

All Maryland cases down to *Stokes v. Taxi Operators Assn.,* 248 Md. 690, 237 A. 2d 762 (1968) [4] continued to hold

---

4. *Furstenburg v. Furstenburg,* 152 Md. 247, 136 A. 534 (1927); *David v. David,* 161 Md. 532, 157 A. 755 (1932); *Riegger v. Brewing Company,* 178 Md. 518, 16 A. 2d 99 (1940); *Gregg v. Gregg,* 199 Md. 662, 87 A. 2d 581 (1952); *Fernandez v. Fernandez,* 214 Md. 519 (1957); *Hudson v. Hudson,* 226 Md. 521, 174 A. 2d 339 (1961); *Stokes v. Taxi Operators Assn.,* 248 Md. 690, 237 A. 2d 762 (1968).

that the interspousal immunity doctrine remained viable and barred tort actions by spouse against spouse. All of those cases were discussed by Judge Marvin Smith of this Court in *Lusby v. Lusby,* 283 Md. 334, 390 A. 2d 77 (1978).

Under the guidance of the majority opinion in *Thompson, supra,* courts of last resort in many States initially supported continued viability of the interspousal immunity doctrine. Indeed, as late as 1965 the Supreme Court of Ohio in *Lyons v. Lyons,* 208 N.E. 533, 536-7 (Ohio 1965) declared, "This court is not convinced that a useful purpose would be served in overthrowing the rule of interspousal immunity from suit so well established in a majority of jurisdictions in this country."

It is plain, however, that courts that initially had continued in support of the doctrine were troubled by the earliest decisions. *Klein v. Abramson,* 513 S.W.2d 714, 717 (Mo. App. 1974). The opinions in decisions of this Court upon the issue demonstrate that we had misgivings concerning our holdings in the line of cases from *Furstenburg* to *Stokes.*[5]

Distinguished Judges of this Court have indicated that they were troubled by the reasoning of its earliest decision.

In *Gregg v. Gregg,* 199 Md. 662, 666, 87 A. 2d 581, 582-83 (1951), then Chief Judge Marbury questioned the validity of the reasoning in *Thompson v. Thompson, supra,* and the early decisions that had rejected abrogation of the interspousal immunity doctrine: "[U]pon the technical and artificial ground that the identity of husband and wife persists in its original vigor *until it has been completely dissolved by express legislative mandate, in respect to all matters which the Legislature has not expressly included within the meaning of the emancipatory statutes,* but upon

---

5. Those Maryland cases collectively contained citations to decisions in nine states as supportive of the Maryland position: California, Iowa, Maine, Michigan, Missouri, Nebraska, New Jersey, New York, Pennsylvania. It is ironic, but symptomatic of current thought, that eight of those nine states have fully or partially abrogated the interspousal immunity doctrine. Only Missouri continues to support it.

the broader sociological and political ground that it would introduce into the home, the basic unit of organized society, discord, suspicion and distrust, and would be inconsistent with the common welfare." Chief Judge Marbury then pointed out that "This last ground is as artificial as the first. It applies to a post-bellum situation a theory which is clearly only applicable to conditions prior to the difficulty which caused the bringing of the legal action. After discord, suspicion and distrust have entered the home, it is idle to say that one of the parties shall not be allowed to sue the other because of fear of bringing in what is already there. However, these ancient theories which form a part of the common law have to be followed by us unless they have been changed by legislative action, and the clear import of the decision in the *David* [*v. David,* 161 Md. 532 (1932)] case is that the emancipatory statutes must be strictly construed." at 666, *et seq.* of 199 Md.

Former Chief Judge Hammond in *Fernandez v. Fernandez,* 214 Md. 519, 135 A.2d 886 (1957) said: (at page 521 of 214 Md.) "The cases in Maryland have interpreted the [Married Womens] Act with such strictness and have given it such limited effect that we find ourselves unable to follow the authorities elsewhere without overruling our prior decisions, despite the appeal to reason and convenience that the rule urged upon us [abrogation of interspousal immunity] has." Judge Hammond also pointed out that the literal language of the Act authorized suits against the husband for both tort and breach of contract. *Id.* at 524.

The changes occurring since 1965 are astounding. At this time, excluding Maryland, all of the other 49 States [6] now have addressed the issue with the following results:

1. 12 States continue to recognize the doctrine.

2. 35 States have abrogated the doctrine fully or partially.

3. In 2 States, a rule of immunity is imposed by statute.

---

**6.** See Appendix A, wherein references will be found to decisions in all our sister States, in the District of Columbia and in the United States Circuit Court of Appeals for the Fourth Circuit, with a brief summary of their holdings.

### States continuing to recognize doctrine

Twelve states continue to recognize the doctrine; Delaware, Florida, Georgia, Hawaii, Kansas, Mississippi, Missouri, Montana, Ohio, Oregon, Tennessee, and Wyoming.[7]

The basis for decision varied in the above states but quotations from three will present all of the reasons assigned for retention of the doctrine.

In *Alfree v. Alfree,* 410 A. 2d 161 (1979), the Delaware Supreme Court reexamined its position recognizing the doctrine and continued to support it, saying at pages 162-63:

"It is settled law in Delaware that one spouse may not sue the other at law in tort. *Plotkin v. Plotkin,* Del. Supr., 125 A. 455 (1924); *Peters v. Peters,* 20 Del. Ch. 28, 169 A. 298 (1933); *du Pont v. du Pont,* 33 Del. Ch. 571, 98 A. 2d 493 (1953); *Owens v. Owens,* Del. Supr., 149 A. 2d 320 (1959); *Saunders v. Hill,* Del. Supr., 202 A. 2d 807 (1964); *Fields v. Synthetic Ropes, Inc.,* Del. Supr., 215 A. 2d 427 (1965) and *Short Line, Inc. of Penn. v. Perez,* Del. Supr., 238 A. 2d 341 (1968). We are not persuaded that the common law rule as recognized by the Superior Court in the *Plotkin* case in 1924 and by the Court of Chancery and the Supreme Court since 1924 should be overruled by judicial decision. '[T]he right [of spouses] to sue each other strikes at the very heart of domestic relations and its effect not only upon the home ties, but upon society generally would be far reaching.' *Plotkin v. Plotkin, supra,* 125 A. at 457.

We are aware of the modern, widespread criticism of the rationale of the doctrine. See e.g. *Merenoff v. Merenoff,* 76 N.J. 535, 388 A. 2d 951, 958-960 (1978). ['... currently only a handful of courts unqualifiedly retain the doctrine in its

---

7. See Appendix A.

pristine formulation' 388 A. 2d at 954; and '[i]t is clear, . . ., that despite its survival in varying forms, interspousal immunity is no longer the doctrinal monolith it was in olden times.' 388 A. 2d at 955.] But, nonetheless, we think that, in addition to its time-honored recognition in this State, it retains sufficient merit to warrant continued adherence by this Court for two sets of reasons.

First as to tort law, elimination of the doctrine could: (1) open up the possibility of various tort actions such as assault and intentional infliction of emotional harm which could go to the heart of public policy and legislative policy relating to marriage; (2) make many routine automobile cases by way of contribution an involuntary suit of one spouse against another; (3) make common automobile negligence issues, including assumption of the risk and guest statute questions, ones of aggravated accusation by one spouse against another; and (4) affect legislative policy in the no-fault insurance field.

Second, as to property law, we note that marriage has many protective attributes not available to others including the duty to support, the right to inherit, and the right to hold property free from assault by a spouse's individual creditors as tenants by the entirety. Thus, the public policy relating to the marriage status is more complex than treatment of interspousal immunity doctrine in isolation would suggest.

Like the public policy considerations involved in the oft-attacked Automobile Guest Statute, the problem is 'more appropriate for legislative solution than for judicial determination. The General Assembly has access to relevant information bearing upon these matters more significant than any afforded this Court, bound as it is by the limitations of the record of this judicial proceeding.' *Jus-*

*tice v. Gatchell,* Del. Supr., 325 A. 2d 97, 102 (1974). 'If a change is to be effected in the well-settled public policy of this State, such change must be effected by the Legislature and not by this court.' *Saunders v. Hill, supra,* 202 A. 2d at 810."

In *Raisen v. Raisen,* 379 So. 2d 352 (1979), the Supreme Court of Florida in a 4-3 decision, continued to support the doctrine, saying at page 355:

"Adversary tort lawsuits between spouses have an upsetting and embittering effect upon domestic tranquility and the marital relationship. But non-adversary lawsuits that do not disturb the peace and harmony of the marriage encourage fraudulent and collusive claims, particularly where a third-party insurance company must pay any judgment awarded. Florida's solution to this dilemma since 1829 has been interspousal tort immunity. This is still a viable solution. There have been many changes in Florida since 1829, but the policy reasons justifying interspousal tort immunity still exist.

Accordingly, we hold that the common law doctrine of interspousal tort immunity is still viable in Florida and that it precludes a tort action between husband and wife in all cases."

In *Robeson v. Int'l. Indemnity Co.,* 282 S.E. 2d 896 (Ga. 1981), the Supreme Court of Georgia, acknowledging widespread modern criticism of the doctrine that in the last decade had been abrogated in an increasing number of states, the majority opinion nevertheless said at page 898, *et seq.:*

"For two reasons, we hold that the doctrine of interspousal immunity should not now be abrogated by this court.

(a) If interspousal tort litigation was allowed, it would be broadly divisible into two distinct types:

> those suits in which the judgment would actually be paid by one of the spouses and those suits in which an insurance company would be liable for payment of the judgment. Since husband and wife do live from the same purse, it is somewhat problematic to order one to pay a money judgment obtained by the other in a tort suit for personal injury. It is, in essence, a taking from Peter to pay Paul[ine]. And those suits in which the judgment is to be paid by an insurance company are invariably friendly and/or collusive, at least as between the spouses. The present case is no exception. As previously stated, defendant Joel does not deny that he was negligent."

From the totality of decisions in the twelve states retaining intact the interspousal immunity doctrine, we glean the following reasons for such retention:

1. The unity of husband and wife.
   *Peters v. Peters,* 634 P. 2d 586 (Hawaii 1981)

2. Interspousal tort actions will destroy the harmony of the marital relationship.
   *Alfree v. Alfree; Raisen v. Raisen, Robeson v. Int'l. Indemnity Co., all supra; Peters v. Peters,* 634 P. 2d 586 (Hawaii 1981)[8]; *Sink v. Sink,* 239 P. 2d 933 (Kan. 1952); *Varholla v. Varholla,* 383 N.E. 2d 888 (Ohio 1978)

3. Retention of the doctrine will prevent collusive and fraudulent claims.
   *Alfree v. Alfree, Raisen v. Raisen, both supra; Peters v. Peters,* 634 P. 2d 586 (Hawaii 1981)

4. Retention of the doctrine will guard against an increase in trivial claims.
   *Alfree v. Alfree, supra; Smith v. Smith,* 287 P.

---

8. We note, however, that Ch. XI, Sec. 5 of the Hawaiian Acts of 1888, which granted married women the right to sue in their own names contained the specific provision that ". . . this section shall not be construed to authorize suits between husband and wife." *(Peters v. Peters,* at page 590 of 634 P. 2d).

2d 572 (Oregon 1955); *Varholla v. Varholla,* 383 N.E. 2d 888 (Ohio 1978)

5.  Divorce and criminal courts furnish adequate redress.
    *Thompson v. Thompson, supra; McKinney v. McKinney,* 135 P. 2d 940 (Wyo. 1943); *Austin v. Austin,* 100 So. 591 (Miss. 1924)

6.  Change is solely within the purview of the Legislature.
    *Alfree v. Alfree, supra; Rogers v. Rogers,* 177 S.W. 382, 384 (Mo. 1915); *McKinney v.McKinney,* 135 P. 2d 940 (Wyo. 1943); *Austin v. Austin,* 100 So. 591 (Miss. 1924); *Wooley v. Parker,* 432 S.W. 2d 882 (Tenn. 1968).

In *McKinney v. McKinney,* 135 P. 2d 940 (1943), the Supreme Court of Wyoming (a three Judge court) after holding that the Statutes of the State did not abrogate the common law rule of interspousal immunity for torts, expressed the view that the doors of courts should not open for ordinary actions for negligence between the spouses when if the domestic tranquility has been so thoroughly upset and the parties have lost all affection for each other, the divorce court is always available; and that the legislature is the proper body to make such an important change of policy as opening a field for disturbing the tranquility of family relations.

A concurring Judge in *McKinney* urged that there is no reason to deny interspousal actions in motor torts where there was insurance protection. He acknowledged that such a course created danger of fraud and collusion but maintained that the courts possess the power to prevent such danger.

A dissenting Judge expressed the view that the State's Married Womens Act left no basis for the common law disability of the spouses to sue each other.

As previously stated, 35 States have abrogated the doctrine fully or partially. It would unduly prolong this opinion

to set forth in full detail the basis for decision in every such State. We believe that quotations from opinions in a few of such States will serve fully to present all of the reasons for the conclusion that abrogation of the doctrine was required.

### States abrogating doctrine

(8 partially, 27 fully)

A.  Partially abrogated in 8 States.
   1.  As to motor torts
       6 States [9]
   2.  As to all personal injury actions
       1 State (Iowa)
   3.  As to intentional torts only
       1 State (Texas) [10]

### A. 1. Abrogating as to motor torts

In *Lewis v. Lewis*, 351 N.E. 2d 526 (Mass. 1976), the Supreme Judicial Court of Massachusetts said at page 532 *et seq.*:

> "The defendant further argues that even if interspousal immunity is not mandated by statute, a common law rule of such long standing should be abolished, if at all, by legislative and not judicial action. The defendant concedes, as he must, that it is within the power and authority of the court to abrogate this judicially created rule; and the mere longevity of the rule does not by itself provide cause for us to stay our hand if to perpetuate the rule would be to perpetuate inequity. When the rationales which gave meaning and coherence to a

---

**9.** Abrogating as to motor torts are: Idaho, Massachusetts, Nevada, Rhode Island, Vermont, Virginia.

**10.** Other States had abrogated the doctrine as to intentional torts only but later enlarged the abrogation: See: Rogers v. Yellowstone Park Co., 539 P. 2d 566 (Idaho 1975); MacDonald v. MacDonald, 412 A. 2d 71 (Maine 1980); Maestas v. Overton, 531 P. 2d 947 (New Mexico 1975).

judicially created rule are no longer vital, and the rule itself is not consonant with the needs of contemporary society, a court not only has the authority but also the duty to reexamine its precedents rather than to apply by rote an antiquated formula. Chief Justice Vanderbilt described this interaction between the judiciary and the evolving common law in an oft cited passage from *State v. Culver,* 23 N.J. 495, 505, 129 A. 2d 715, 721, cert. denied, 354 U.S. 925, 77 S. Ct. 1387, 1 L.Ed.2d 1441 (1957): 'One of the great virtues of the common law is its dynamic nature that makes it adaptable to the requirements of society at the time of its application in court. There is not a rule of the common law in force today that has not evolved from some earlier rule of common law, gradually in some instances, more suddenly in others, leaving the common law of today when compared with the common law of centuries ago as different as day is from night. The nature of the common law requires that each time a rule of law is applied it be carefully scrutinized to make sure that the conditions and needs of the times have not so changed as to make further application of it the instrument of injustice. Dean Pound posed the problem admirably in his *Interpretations of Legal History* (1922) when he stated, 'Law must be stable, and yet it cannot stand still.'

This court has frequently had occasion to effect through its decisions not insignificant changes in the field of tort law. See, e.g., *Sorensen v. Sorensen,* 369 Mass. 350, 339 N.E.2d 907 (1975); *Mone v. Greyhound Lines, Inc.,* 368 Mass. 354, 331 N.E.2d 916 (1975); *Diaz v. Eli Lilly & Co.,* 364 Mass. 153, 302 N.E.2d 555 (1973), and cases cited at 166 n. 43, 302 N.E.2d 555. In the *Diaz* case, in rejecting the argument that the court should defer to the Legislature on the question of recovery for loss of

consortium, we noted that 'the Legislature may rationally prefer to act, if it acts at all, after rather than before the common law has fulfilled itself in its own way.' *Id.* at 166, 302 N.E.2d at 563. We are of opinion that this is an especially appropriate comment in the context of this case where the Legislature in G.L. c. 209, Section 6, has recognized the rule of interspousal immunity but has left the rule in its common law form, expressing the preference, at least implicitly, that this court continue to evaluate the usefulness and propriety of the rule. We further note that the argument that any change in the doctrine of interspousal immunity should come from the Legislature, not the judiciary, has been considered and rejected in many decisions abrogating the common law rule.

\* \* \*

We conclude therefore that it is open to this court to reconsider the common law rule of interspousal immunity and, having done so, we are of opinion that it should no longer bar an action by one spouse against another in a case such as the present one. We believe this result is consistent with the general principle that if there is tortious injury there should be recovery, and only strong arguments of public policy should justify a judicially created immunity for tortfeasors and bar to recovery for injured victims. See *Morash & Sons, Inc. v. Commonwealth,* 363 Mass. 612, 621, 296 N.E.2d 461 (1973); *Freehe v. Freehe, supra,* 81 Wash.2d at 192, 500 P.2d 771. We have examined the reasons offered in support of the common law immunity doctrine and, whatever their vitality in the social context of generations past, we find them inadequate today to support a general rule of interspousal tort immunity. In arriving at this conclusion we are mindful that the rights and privileges of husbands and wives with respect to one another are not unaffected by the

marriage they have voluntarily undertaken together. Conduct, tortious between two strangers, may not be tortious between spouses because of the mutual concessions implied in the marital relationship. For this reason we limit our holding today to claims arising out of motor vehicle accidents."

In *Rupert v. Stienne,* 528 P. 2d 1013 (1974), the Supreme Court of Nevada rejected the suggestions that interspousal actions in motor torts may be fraudulent or collusive by saying the principle "belies the centuries old trust in our jury system" and that "Our adversary system will ferret out the non meritorious claims . . . ." (at p. 1015) The Court then commented that other permitted interspousal litigation was as likely to bring about family discord as actions for personal torts.

In departing from the doctrine of interspousal immunity, the Court explicitly limited its decision to claims arising out of motor vehicle accidents.

In *Digby v. Digby,* 388 A. 2d 1 (1978), the Supreme Court of Rhode Island pointed out that although in prior cases the Court had declared that the question of abrogation or retention of the doctrine should originate with the legislature, "we abdicate our own function, in a field peculiarly nonstatutory when we refuse to consider an old and unsatisfactory court made rule." (at p. 2) The Court then spoke to the suggested issue of conjugal discord and adopted the views expressed in *Lewis, supra,* and restricted its holding to motor torts for the reasons stated in that case.

Reasoning to the same effect were *Richard v. Richard,* 300 A. 2d 637 (Vt. 1973) and *Surratt v. Thompson,* 183 S.E. 2d 200 (Va. 1971).

A. 2. Abrogating as to all personal injury actions

1 State

In *Shook v. Crabb,* 281 N.W.2d 616, 617, the Supreme Court of Iowa spoke to the legislative function argument as follows:

[1] If the legislature chose to address the question, any enactment by it would be dispositive, absent constitutional objection. Yet when a doctrine or rule is of judicial origin, we would 'abdicate our own function, in a field peculiarly nonstatutory, when we refuse to reconsider an old and unsatisfactory court-made rule', *Woods v. Lancet,* 303 N.Y. 349, 355, 102 N.E. 2d 691, 694 (1951). A clear majority of jurisdictions which have considered this argument have found subject matter ripe for determination and reached the merits of the issue.

The Court observed that concern about a possible deluge of interspousal actions has not been realized in jurisdictions which have completely abolished the doctrine, citing *Richard v. Richard,* 131 Vt. at 105, 300 A.2d 641.

A. 3. Abrogating as to intentional torts only: 1 State [11]

The Supreme Court of Texas in *Bounds v. Caudle,* 560 S.W. 2d 925 (Texas 1977) after declaring that the doctrine "has come under severe attack from nearly all courts that have considered [it]", found there was "no sound basis for barring a suit for an intentional tort."

B. Fully abrogated in 27 States.

The Supreme Court of the United States in *Thompson v. Thompson, supra,* at page 619 of 218 U.S. and at page 1183 of 54 L. Ed., said: "In no act called to our attention has the right of the wife been carried to the extent of opening the courts to complaints of the character of the one here involved."

The Courts of many States [12] have so interpreted Married Womens Acts and other statutes.

---

**11.** Texas.
**12.** Arizona, Arkansas, Connecticut, Michigan, New Hampshire, New York, Oklahoma, South Carolina, South Dakota and Wisconsin. See Appendix A.

In 1914 the Supreme Court of Errors of Connecticut in *Brown v. Brown,* 88 Conn. 42, 89 A. 889, after citing two prior cases sustaining suits for breach of contract under Connecticut's Married Womens Act, said at page 891 of 89 A.:

"If a cause of action in her favor arises from the wrongful infliction of such [contractual] injuries upon her by another, why does not the wrongful infliction of such injuries by her husband now give her a cause of action against him? If she may sue him for a broken promise, why may she not sue him for a broken arm? The defendant's answer is that a wise public policy forbids it. . . ..

\* \* \*

In the fact that the wife has a cause of action against her husband for wrongful injuries to her person or property committed by him, we see nothing which is injurious to the public or against the public good or against good morals. This is the usual test for determining whether a statute or a contract is against public policy. When a wife is allowed to possess and deal with her own property and carry on business in her own name like a feme sole, she ought to have the same right to contract and enforce her contracts, and the same remedies for injuries to her person and property which others have, and to be liable upon her contracts and for her torts the same as others are. This is the position in which she now stands. The danger that the domestic tranquility may be disturbed if husband and wife have rights of action against each other for torts, and that the courts will be filled with actions brought by them against each other for assault, slander, and libel, as suggested in some of the cases cited in behalf of the defendant, we think is not serious."

Other cases rejecting the views of the majority in *Thompson v. Thompson, supra,* and adopting the views of the dissenting Justice Harlan are:

*Fiedeer v. Fiedeer,* 140 P. 1022 (Okla. 1914)

*Gilman v. Gilman,* 95 A. 657 (N. H. 1915)

*Prosser v. Prosser,* 102 S.E. 787 (S. C. 1920)

*Wait v. Pierce,* 209 N.W. 475 (Wis. 1926)

*Fitzpatrick v. Owens,* 186 S.W. 832 (Ark. 1916)

*Scotvold v. Scotvold,* 298 N.W. 266 (S. D. 1941)

See, also, *Hosko v. Hosko,* 187 N. W. 2d 236 (Mich. 1971); *State Farm Mut. Auto. Ins. Co. v. Westlake,* 324 N.E.2d 137 (N. Y. 1974).

*Brown v. Gosser,* 262 S.W. 2d 480 (Ky. 1953) discussed three of the suggested bases for retention of the doctrine:

(As to marital harmony) "It is difficult to see how an action for personal injuries would disrupt domestic peace and tranquility more than an action for damage to property;

(As to fraud) "The fear that relaxation of the common law rule will open the door to fraudulent and fictitious claims, especially against insurance companies, has less force than the argument of 'domestic peace and felicity.' We are not willing to admit that the courts are so ineffectual, nor our jury system so imperfect, that fraudulent claims cannot be detected and disposed of accordingly."

(As to *stare decisis*) "The appellant relies strongly on the principle of stare decisis to maintain his position that the common law rule still exists undisturbed in Kentucky. It must be admitted that stare decisis supports his position, but it seems to us the words of Mr. Justice Brandeis in State of Washington v. W. C. Dawson & Co., 264 U.S. 219, 44 S. Ct. 302, 309, 68 L. Ed. 646, are applicable here:

'Stare decisis is ordinarily a wise rule of action. But it is not a universal, inexorable command. The instances in which the court has disregarded its admonition are many.' " (at page 484 of 262 S.W. 2d)

*MacDonald v. MacDonald,* 412 A. 2d 71 (Me. 1980) discussed the principle of *stare decisis* as it applies to the doctrine of interspousal immunity, saying at page 74:

"In recent years, too, we have forcefully stated that in matters of tort involving the marital relationship we cannot 'stubbornly, hollowly and anachronistically' stay bound by the 'shackles' of the 'formalisms' of the common law. *Moulton v. Moulton, supra,* at 227. We have also stressed that by so declaring, we do not undermine the principle of *stare decisis.* Rather, we prevent it from defeating itself; we do not permit it to mandate the mockery of reality and the 'cultural lag of unfairness and injustice', *Moulton v. Moulton, supra,* at 228, which would arise if the judges of the present, who like their predecessors cannot avoid acting when called upon, were required to act as captives of the judges of the past, restrained without power to break even those bonds so withered by the changes of time that at the slightest touch they would crumble."

*Fernandez v. Romo,* 646 P. 2d 878 (Ariz. 1982) reexamining earlier Arizona decisions, discussed the principles of unity, domestic tranquility and fraud and collusion and found none to furnish a sound basis for retention of the doctrine. The Court said:

"The doctrine of interspousal tort immunity cannot be supported by an antiquated and narrow 'unity' doctrine that perpetuates the fiction of female disability if not inferiority. Whatever logic the unity doctrine had in times gone by, it cannot operate today as a reason for supporting the doctrine of interspousal tort immunity.

* * *

We doubt, however, that family harmony will be damaged any more by allowing a suit for the negligent infliction of injury upon a spouse than the damage that will be done if the injury goes unredressed. (at p. 881)

* * *

While the courts should be alert to note fraud and collusion when it exists, the fact that there is an opportunity for fraud or collusion should not be a reason for denying admission to the courts in cases of interspousal tort liability." (at p. 882)

*Merenoff v. Merenoff*, 388 A. 2d 951 (N.J. 1978), in abrogating the doctrine of interspousal immunity, discussed some of the principles sometimes offered as justification for its retention. As to domestic harmony, the Court said:

"The threat to domestic harmony posed by a legal action between spouses is an imponderable; the cohesiveness of a marriage may be jeopardized as much by barring a cause as by allowing it." (at page 959)

As to fraud, the Court said:

"We entertain no doubt that our courts have at their command ample means to cope with the real or asserted spectre of fraud in the context of marital tort claims. For example, the courts could, if necessary, fashion a high standard of care to compensate for the risk of collusion between the parties. Or this danger could be addressed by imposing a burden of proof commensurate with the dimensions of fraud perceived in the particular case or situation. Moreover, the full glare of truth may be the best antidote for fraud. Insurance companies might in appropriate circumstances reveal their status in the case, treating the covered defendant-spouse as a

hostile witness in order to attack credibility and show that the husband and wife may be scheming to gain a recovery against the insurance company." (Cites omitted) (at page 961)

As to alternative remedies, the Court said:

"We add, on a closing note as to the existence of reasons asserted for the continuation of the doctrine of interspousal immunity, that no court in this day and age subscribes seriously to the view that the abrogation of marital immunity for tortious injury is 'unnecessary' because redress for the wrong can be obtained through other means. This additional, 'alternative remedy' theory was advanced generations ago as a justification for retaining interspousal tort immunity in *Thompson v. Thompson,* 218 U.S. 611, el. S. Ct. 111, 54 L. Ed. 1180 (1910) and was even then the subject of dissent. The criminal law may vindicate society's interest in punishing a wrongdoer but it cannot compensate an injured spouse for her or his suffering and damages. Divorce or separation provide escape from tortious abuse but can hardly be equated with a civil right to redress and compensation for personal injuries." (Cites omitted) (at page 962).

*See, also Maestas v. Overton,* 531 P. 2d 947 (N.M. 1975); *Freehe v. Freehe,* 500 P. 2d 771 (Wash. 1972); *Imig v. March,* 279 N.W. 2d 382 (Neb. 1979).

In *Self v. Self,* 376 P. 2d 65 and in *Klein v. Klein,* 376 P. 2d 70 (1962), the Supreme Court of California on the same day (November 9, 1962) abrogated the interspousal immunity as to intentional torts in *Self* and as to negligent torts in *Klein.*

In *Self* the Court said ". . . the general rule is and should be that, in the absence of statute or some compelling reason of public policy, where there is negligence proximately causing an injury, there should be liability" . . .; "that the

fundamental basis of the interspousal disability doctrine — legal identity of husband and wife — no longer exists; ... and that "the contention that the rule is necessary to maintain conjugal·harmony — ... — is illogical and unsound." (376 P. 2d at 69)

In *Klein* the Court after stating that it was argued that to permit tort actions based on negligence to be maintained between spouses will cause the courts to be inundated with trifling suits, will tend to destroy conjugal harmony, and, because of the possibility of insurance, would encourage collusion, fraud and perjury, adopted the reasoning in *Self* and added: "The argument about inundating the Courts with trifling suits is palpably unsound." The Court brushed aside the fraud and insurance contentions by saying: "It would be a sad commentary on the law if we were to admit that the judicial processes are so ineffective that we must deny relief to a person otherwise entitled simply because in some future case a litigant may be guilty of fraud or collusion. Once that concept were accepted, then all causes of action should be abolished. Our legal system is not that ineffectual." (At page 73 of 376 P. 2d)

In *Coffindaffer v. Coffindaffer,* 244 S.E. 2d 338 (1978) the Supreme Court of West Virginia discussed two commonly asserted grounds in support of the rule, i.e. the disruption of family harmony and the potential for fraud and collusion. The Court declared ". . . it is difficult to perceive how any law barring access to the courts for personal injuries will promote harmony; and that "We do an injustice not only to the intelligence of jurors, but to the efficacy of the adversary system, when we express undue concern over the quantum of abusive or meritless law suits." (at p. 342)

In *Hack v. Hack,* 433 A. 2d 859 (Pa. 1981), the Supreme Court of Pennsylvania declared that the social policy reasons traditionally given for immunizing a tortfeasor spouse from liability for his wrongs were:

1. The unity of husband and wife

2. The promotion of family harmony
3. The prevention of collusive actions, and
4. The avoidance of trivial claims.

As to (1), the Court stated that the very purpose of Married Womens Acts was to abolish this concept of law; as to (2) the Court expressed the belief that an action in tort for negligence would be less likely to disturb family harmony than permitted causes of action for breach of contract or conversion that typically involve intentional wrongdoing; as to (3), the Court adopted the reasoning of the Court in *Immer v. Risko,* 267 A. 2d 481, 488 (1970) (N.J. 1970) that "it seems unjust to deny the claims of the many because of the potentiality for fraud by the few"; and as to (4), the Court declared that the suggested avoidance of trivial claims is subject to the same analytical weakness as the argument regarding possible collusion. The Court concluded by saying "Having concluded that marital relationship alone may not deny a party redress for injury, we abolish the defense of interspousal immunity as a bar to suits in the courts of this Commonwealth." (433 A. 2d at page 869).

To the same effect are:

> *Stoker v. Stoker,* 616 P. 2d 590 (Utah 1980)
> *Rains v. Rains,* 46 P. 2d 740 (Colo. 1935)
> *Crowell v. Crowell,* 105 S.E. 206, *reh. den.* 106 S.E. 149 (N.C. 1920)
> *Penton v. Penton,* 135 So. 481 (Ala. 1931)
> *Fitzmaurice v. Fitzmaurice,* 242 N.W. 526 (N.D. 1932)
> *Brooks v. Robinson,* 284 N.E. 2d 794 (Ind. 1972)
> *Beaudette v. Frana,* 173 N.W. 2d 416 (Minn. 1969)
> *Cramer v. Cramer,* 379 P. 2d 95 (Alaska 1963)

Legal scholars quite clearly believe that modern social conditions justify abrogation of the common law rule. As early as 1956, Harper and James, noting that "a few liberal decisions have permitted the action for the husband's negligence," declared:

"This result seems eminently desirable. The metaphysical and practical reasons which prevented such actions at common law are no longer applicable. The danger to the family peace and tranquility ... has been grossly overemphasized. Sound policy and ordinary fairness commend the right of the wife to recover for tortious invasions of her interests in personality by her husband." Harper & James: The Law of Torts, Section 8.10 Vol. I, p. 645 *et seq.*

Dean Prosser thus stated his views concerning current viability of the interspousal immunity doctrine:

"The courts which follow this majority view [13] [that the doctrine remains viable] have buttressed their conclusion by inventing new arguments, not found in the early cases, for denying the remedy. Apart from stare decisis or judicial inertia, and the policy of strict construction of statutes changing the common law, it has been said that each spouse has remedy enough in the criminal and divorce laws — which obviously is untrue, since neither compensates for the damage done, or covers all the torts that may be committed. Stress has been laid upon the danger of fictitious and fraudulent claims, on the very dubious assumption that a wife's love for her husband is such that she is more likely to bring a false suit against him than a genuine one; and likewise the possibility of trivial actions for minor annoyances, which might well be taken care of by finding consent to all ordinary frictions of wedlock — or at least assumption of risk! The chief reason relied upon by all these courts, however, is that personal tort actions between husband and wife would disrupt and destroy the peace and harmony of the home, which is against the policy of the law.

---

**13.** In the few years since publication of the 4th Edition in 1978 "the majority view" has now become a decided minority. Thirty-five states now have fully or partially abrogated the interspousal immunity doctrine. See Appendix A.

This is on the bald theory that after a husband has beaten his wife, there is a state of peace and harmony left to be disturbed; and that if she is sufficiently injured or angry to sue him for it, she will be soothed and deterred from reprisals by denying her the legal remedy — and this even though she has left him or divorced him for that very ground, and although the same courts refuse to find any disruption of domestic tranquility if she sues him for a tort to her property, or brings a criminal prosecution against him. If this reasoning appeals to the reader, let him by all means adopt it." Prosser Torts 4th Ed. H.B. (1978), pages 862-63.

The American Law Institute's initial publication of the Restatement, Torts, Section 887(b) expressly disclaimed a purpose to "state the common law rules as to the immunity of a spouse from an action by the other spouse . . . ." (1939) Its distillation of the appellate decisions after 1939, however, caused Restatement Torts 2nd, Section 895F (1979) to approve abrogation of the interspousal immunity doctrine:

"Section 895F. Husband and Wife

(1) A husband or wife is not immune from tort liability to the other solely by reason of that relationship.

\* \* \*

Comment:

a. This Section rejects the immunity of one spouse from liability in tort to the other, which for a long time was the universal rule in the English and American courts.

\* \* \*

f. Abrogation. The last two decades have witnessed the definite rejection and abolition of the immunity between husband and wife in its entirety in a substantial number of jurisdictions. Numerous courts have followed a dissenting opinion of Mr. Justice Harlan in Thompson v. Thompson, (1910) 218 U.S. 611, and have held that the Married Women's Acts and the position of equality in which

they were intended to place the spouses have removed all reason and justification for the immunity, and that one spouse is subject to liability to the other for any tort whether it is to property or to the person. The number of these decisions has been on the increase in recent years and has been encouraged by the spread and general use of liability insurance, particularly in automobile cases. The indications are clear that this is the future state of the law in all states. . . ." [14]

Judge Smith, speaking for this Court in *Lusby v. Lusby, supra,* after commenting that "at no time since *Furstenburg,* 152 Md. 247 (1927), has the Court examined the foundation upon which our holdings rest" (at page 352 of 283 Md.), made a careful examination of that foundation. It is fair to say that his examination demonstrated that the foundation was resting on sand.

In capsulation, the opinion in *Lusby, supra,* pointed out (1) the current invalidity of the disabilities imposed upon women by the original rule of law; (2) that the great minds of Supreme Court Justices Harlan, Holmes and Hughes had dissented from the narrow interpretation of the District of Columbia Married Womens Act in *Thompson v. Thompson, supra;* (3) that Chief Judge Marbury was rightly critical [15] of the reasons for decision in the early cases; (4) that Judge Hammond's observation [16] that the literal language of Article 45, Section 5 would authorize tort actions was quite correct [17] and in accord with the view of the dissenters in

---

14. Many other commentators express similar views. *See, e.g.* Greenstone, *Abolition of Intra-family Immunity,* 7 Forum 82 (1972); McCurdy, *Torts Between Persons in Domestic Relation,* 43 Harv. L. Rev. 1030 (1930); Note, *Domestic Relations — Abrogation of Interspousal Immunity — An Analytical Approach,* 19 DePaul L. Rev. 590 (1970); Note, *Litigation Between Husband and Wife,* 79 Harv. L. Rev. 1650 (1966); Note, 6 Seton Hall L. Rev. 1746 (1975); Note, 13 Duq. L. Rev. 156 (1974); Comment, 11 Suffolk U. L. Rev. 1214 (1977); Comment, 36 Mont. L. Rev. 251 (1975); Comment, 12 New Eng. L. Rev. 333 (1976); Comment, 27 Ohio St. L.J. 550 (1966); Comment, 3 Rut.-Cam. L. J. 183 (1971).

15. *Gregg v. Gregg,* 199 Md. 662, 87 A. 2d 581 (1952).

16. *Fernandez v. Fernandez,* 214 Md. 519, 521.

17. *Lusby v. Lusby,* 283 Md. 334, 390 A. 2d 77, footnote 6.

*Thompson, supra;* and (5) that since the decision in *Stokes* in 1968 [18] there has been a parade of cases in which courts have altered the previous common law rule.

The Court in *Lusby, supra,* found it unnecessary, however, to rule upon the question of the continuing viability of the interspousal immunity rule in general negligence cases, declaring:

> ". . . We find nothing in our prior cases or elsewhere to indicate that under the common law of Maryland a wife was not permitted to recover from her husband in tort when she alleged and proved the type of outrageous, intentional conduct here alleged. Note that under the common law in England as reflected in Blackstone it was under 'the *old* common law' that a husband 'might give his wife moderate correction.' (Emphasis added) The type of action in the case at bar not being forbidden by the common law of this State or any statute of this State, it follows that the trial court erred." 283 Md. at page 358, 390 A. 2d at page 89.

In the subject case the issue whether the rule continues to be viable is clearly before us. We share the view now held by the vast majority of American States that the interspousal immunity rule is unsound in the circumstances of modern life in such cases as the subject. It is a vestige of the past. We are persuaded that the reasons asserted for its retention do not survive careful scrutiny. They furnish no reasonable basis for denial of recovery for tortious personal injury. We find no subsisting public policy that justifies retention of a judicially created immunity that would bar recovery for injured victims in such cases as the present. *Lewis v. Lewis,* 351 N.E. 2d 526, 532 (Mass. 1976).

We are mindful of the value of the doctrine of *stare decisis* and aware that for reasons of certainty and stability, changes in decisional doctrine ordinarily should be left to the Legislature. *Harrison v. Montgomery County,* 295 Md. 442, 456 A. 2d 894 (1983).

---

18. *Stokes v. Taxi Operators Ass'n.,* 248 Md. 690.

This is particularly true in cases such as *Harrison, supra,* where the Legislature repeatedly had rejected efforts to achieve legislatively that which we were asked to grant judicially. Moreover, in *Harrison* the requested change from "contributory negligence" to "comparative negligence" required selection from several forms of the latter doctrine — each productive of markedly differing effects upon the rights and obligations of all parties in negligence litigation.

Nonetheless, as we pointed out in *Harrison, supra,* "we have never construed [the doctrine of *stare decisis*] to inhibit us from changing or modifying a common law rule by judicial decision where we find, in light of changed conditions or increased knowledge that the rule has become unsound in the circumstances of modern life, a vestige of the past, no longer suitable to our people." (At page 459 of 295 Md., 903 of 456 A. 2d).

In *Pope v. State,* 284 Md. 309, 341-42 (1979) we said:

> "[The common law] may be changed by legislative act as Art. 5 of the Declaration of Rights expressly provides. . . . It may also be changed by judicial decision. . . . We asserted in *Ass'n of Taxi Oprs. v. Yellow Cab Co.,* 198 Md. 181, 204, 82 A. 2d 106 (1951); 'We have frequently held that it is our duty to determine the common law as it exists in this State. . . .' The doctrine of *stare decisis* does not preclude the exercise of this duty."

In *White v. King,* 244 Md. 348, 354, 223 A. 2d 763 (1966), we said:

> "The doctrine of *stare decisis,* important as it is, is not to be construed as preventing us from changing a rule of law if we are convinced that the rule has become unsound in the circumstances of modern life."

In cases such as the present we have no legislative barrier to abrogation of this outmoded rule of law. Indeed, after legislative passage and approval by the people of Article 46

of the Declaration of Rights any ancient deprivation of rights based upon sex would contravene the basic law of this State.

By the same token, we recognize that "conduct, tortious between two strangers, may not be tortious between spouses because of the mutual concessions implied in the marital relationship", *Lewis v. Lewis, supra,* 351 N.E. 2d at page 532. Decision in such cases necessarily will be determined on a case to case basis.

Accordingly, we abrogate the interspousal immunity rule in this State as to cases sounding in negligence and apply the abrogation to this case and prospectively to all such causes of action accruing after the date of the filing of the opinion in this case.[19]

> *Judgment reversed and case remanded for further proceedings. Costs to be paid by the appellee.*

Davidson, J. concurs in the result.

---

**19.** "Accruing" includes discovery of a cause of action under the discovery rule, but excludes the removal of the common law bar by the rule adopted in this opinion.

## APPENDIX A

Present status of Interspousal Immunity Rule in 49 States other than Maryland; in the District of Columbia; and in Admiralty (CA 4)

Alabama:  Penton v. Penton, 135 So. 481 (1931)
  (Rule fully abrogated)

Alaska:  Cramer v. Cramer, 379 P. 2d 95 (1963)
  (Rule fully abrogated)

Arizona:  Fernandez v. Romo, 646 P. 2d 878 (1982)
  (Rule fully abrogated)

Arkansas:  Leach v. Leach, 300 S. W. 2d 15 (1957)
  (Rule fully abrogated)

California:  Klein v. Klein, 376 P. 2d 70 (1962)
  (Rule fully abrogated)

Colorado:  Rains v. Rains, 46 P. 2d 740 (1935)
  (Rule fully abrogated)

Connecticut:  Brown v. Brown, 89 A. 889 (1914)
  (Rule fully abrogated)

Delaware:  Short Line, Inc. v. Perez, 238 A. 2d 341 (1968)
  (Rule acknowledged and sustained)

Florida:  Raisen v. Raisen, 379 So. 2d 352 (1979)
  (Rule acknowledged and sustained)

Georgia:  Eddleman v. Eddleman, 189 S.E. 833 (1936)
  (Rule acknowledged and sustained)

| | |
|---|---|
| Hawaii: | Tugaeff v. Tugaeff, 42 Hawaii 455 (1958) |
| | Peters v. Peters, 634 P. 2d 586 (1981) |
| | (Rule acknowledged and sustained) |
| Idaho: | Lorang v. Hays, 209 P. 2d 733 (1949) |
| | (Rule abrogated as to intentional torts) |
| | Rogers v. Yellowstone Park Co., 539 P. 2d 566 (1975) |
| | (Rule abrogated as to motor torts) |
| Illinois: | Heckendorn v. First Ntl. Bank, 166 N.E. 2d 571 (1960) |
| | (Rule of immunity imposed by statute) |
| Indiana: | Brooks v. Robinson, 284 N.E. 2d 794 (1972) |
| | (Rule fully abrogated) |
| Iowa: | Shook v. Crabb, 281 N.W. 2d 616 (1979) |
| | (Rule abrogated for all personal injury actions) |
| Kansas: | Sink v. Sink, 239 P. 2d 933 (1952) |
| | (Rule acknowledged and sustained) |
| Kentucky: | Brown v. Gosser, 262 S.W. 2d 480 (1953) |
| | (Rule fully abrogated) |
| Louisiana: | Smith v. Southern Farm Bureau, 174 So. 2d 122 |
| | (Because of the competing effect of two statutes, (Article 2315 and LSA-RS 9:291) has a *cause* of action but no *remedy* to enforce it) |

| | |
|---|---|
| Maine: | MacDonald v. MacDonald, 412 A. 2d 71 (1980)<br>(Rule fully abrogated) |
| Massachusetts: | Lewis v. Lewis, 351 N.E. 2d 526 (1976)<br>(Rule abrogated as to motor torts) |
| Michigan: | Hosko v. Hosko, 187 N.W. 2d 236 (1971)<br>(Rule fully abrogated) |
| Minnesota: | Beaudette v. Frana, 173 N.W. 2d 416 (1969)<br>(Rule fully abrogated prospectively) |
| Mississippi: | Austin v. Austin, 100 So. 591 (1924)<br>(Rule acknowledged and sustained) |
| Missouri: | Rogers v. Rogers, 177 S.W. 382 (1915)<br>(Rule acknowledged and sustained) |
| Montana: | Conley v. Conley, 15 P. 2d 922 (1932)<br>(Rule acknowledged and sustained) |
| Nebraska: | Imig v. March, 279 N.W. 2d 382 (1979)<br>(Rule fully abrogated) |
| Nevada: | Rupert v. Stienne, 528 P. 2d 1013 (1974)<br>(Rule abrogated as to motor torts) |
| New Hampshire: | Gilman v. Gilman, 95 A. 657 (1915)<br>(Rule fully abrogated) |

| | |
|---|---|
| New Jersey: | Merenoff v. Merenoff, 388 A. 2d 951 (1978)<br>(Rule fully abrogated) |
| New York: | State Farm Mut. Auto. Ins. Co. v. Westlake, 324 N.E. 2d 137 (1974)<br>(Rule fully abrogated) |
| New Mexico: | Maestas v. Overton, 531 P. 2d 947 (1975)<br>(Rule fully abrogated) |
| North Carolina: | Crowell v. Crowell, 105 S.E. 206 (1920)<br>(Rule fully abrogated) |
| North Dakota: | Fitzmaurice v. Fitzmaurice, 242 N.W. 526 (1932)<br>(Rule fully abrogated) |
| Ohio: | Lyons v. Lyons, 208 N.E. 2d 533 (1965)<br>(Rule acknowledged and sustained) |
| Oklahoma: | Courtney v. Courtney, 87 P. 2d 660 (1938)<br>(Rule fully abrogated) |
| Oregon: | Smith v. Smith, 287 P. 2d 572 (1955)<br>(Rule acknowledged and sustained) |
| Pennsylvania: | Hack v. Hack, 433 A. 2d 859 (1981)<br>(Rule fully abrogated) |
| Rhode Island: | Digby v. Digby, 388 A. 2d 1 (1978)<br>(Rule abrogated as to motor torts)<br>Asplin v. Amica Mut. Ins. Co., 394 A. 2d 1353<br>(Rule abrogated where death of either spouse intervenes between tortious act and commencement of suit) |

| | |
|---|---|
| South Carolina: | Pardue v. Pardue, 166 S.E. 101 (1932)<br>(Rule fully abrogated) |
| South Dakota: | Scotvold v. Scotvold, 298 N.W. 266 (1941)<br>(Rule fully abrogated) |
| Tennessee: | Lillienkamp v. Rippetoe, 179 S.W. 628 (1915)<br>(Rule acknowledged and sustained) |
| Texas: | Bounds v. Caudle, 560 S.W. 2d 925 (1977)<br>(Rule abrogated as to intentional torts) |
| Utah: | Stoker v. Stoker, 616 P. 2d 590 (1980)<br>(Rule fully abrogated) |
| Vermont: | Richard v. Richard, 300 A. 2d 637 (1973)<br>(Rule abrogated as to motor torts) |
| Virginia: | Surratt v. Thompson, 183 S.E. 2d 200 (1971)<br>(Rule abrogated as to motor torts) |
| Washington: | Freehe v. Freehe, 500 P. 2d 771 (1972)<br>(Rule fully abrogated) |
| West Virginia: | Coffindaffer v. Coffindaffer, 244 S.E. 2d 338 (1978)<br>(Rule fully abrogated) |
| Wisconsin: | Wait v. Pierce, 209 N.W. 475 (1926)<br>(Rule fully abrogated) |

Wyoming:                    McKinney v. McKinney, 135 P. 2d
                           940 (1943)
                                   (Rule acknowledged and
                                   sustained)
District of Columbia:      Thompson v. Thompson, 218 U.S.
                           611, 54 L. Ed. 1180 (1910)
                                   (Rule acknowledged and
                                   sustained)
Admiralty (CA 4):          Byrd v. Byrd, 657 F. 2d 615 (1981)
                                   ("Interspousal immunity
                                   is a doctrine whose day
                                   has come and gone," p.
                                   621)

*Couch, J., dissenting:*

The Court today has abrogated the common law rule of interspousal immunity as to cases sounding in negligence. I must respectfully dissent, not because of any personal opinion against allowing such actions brought by one spouse against another, but because I believe this change involves public policy and that policy change is best made by the legislature.

The thrust of the majority's reasoning appears to be that the immunity rule no longer has a valid basis and the trend throughout our sister jurisdictions is to abrogate it. While I recognize that "[t]he common law is . . . subject to modification by judicial decision in light of changing conditions or increased knowledge where this Court finds that it is a vestige of the past, no longer suitable to the circumstances of our people[,]" *Felder v. Butler,* 292 Md. 174, 182, 438 A.2d 494, 499 (1981), in my view this involves a matter of public policy. As such, I believe it then becomes a matter normally for the legislature. In *Felder,* Chief Judge Murphy wrote for the Court:

> "Although empowered to change common law rules in light of changed conditions, the Court has always recognized that declaration of public policy is normally the function of the legislative branch of government. *Adler [v. American Standard Corp.],* 291 Md. [31,] at 45 [, 432 A.2d 464 (1981)]. The Court has therefore declined to alter a common law rule in the face of indications that to do so would be contrary to the public policy of the State, as declared by the General Assembly of Maryland." *Id.* at 183, 438 A.2d at 499.

If, indeed, we were writing on a clean slate, the majority's view could very well be supported. The fact of the matter is, however, that this issue has been before the Court, in one form or another, since the passage of the Married Women's Act of 1898. In *Lusby v. Lusby,* 283 Md. 334, 390 A.2d 77 (1978), Judge Smith thoroughly reviewed the many

instances in which this Court was concerned with the interpretation of what is now Maryland Code (1957, 1982 Repl. Vol.), Art. 45, § 5, in the context of interspousal immunity.[1] During his review, Judge Smith wrote that not all of our sister jurisdictions "have jumped on the bandwagon of those who would abolish interspousal immunity[,]" pointing out that "[a] number of decisions have upheld th[e] doctrine, even where the marital relationship had terminated before the filing of the tort action." *Id.* at 349, 390 A.2d at 84. Furthermore, *Lusby* pointed out that in some of these prior cases the Court, in effect, invited the legislature to enact legislation abrogating the immunity rule and stated if any change was to be made it would have to come from that body. Finally, he also stated that "[t]he General Assembly has not heeded the suggestions by this Court that a new statute be enacted." [2] *Id.* at 357, 390 A.2d at 88. Thus, it is clear to me that for over a half century this Court has periodically concerned itself with the concept of interspousal immunity and has consistently refused, by judicial fiat, to abrogate the rule, leaving it to the legislature to deal with it according to its perception of public policy.

As the Supreme Court of Delaware observed in *Alfree v. Alfree,* 410 A.2d 161, 163 (1979), *appeal dismissed,* 446 U.S. 931, 100 S.Ct. 2145, 64 L.Ed.2d 783 (1980):

"[T]he problem [of abrogating the doctrine of interspousal tort immunity] is 'more appropriate for legislative solution than for judicial determination.

---

1. Stokes v. Taxi Operators Ass'n, 248 Md. 690, 237 A.2d 762 (1968); Hudson v. Hudson, 226 Md. 521, 174 A.2d 339 (1961); Ennis v. Donovan, 222 Md. 536, 161 A.2d 698 (1960); Fernandez v. Fernandez, 214 Md. 519, 135 A.2d 886 (1957); Gregg v. Gregg, 199 Md. 662, 87 A.2d 581 (1952); Riegger v. Brewing Company, 178 Md. 518, 16 A.2d 99 (1940); David v. David, 161 Md. 532, 157 A. 755 (1932); Furstenburg v. Furstenburg, 152 Md. 247, 136 A. 534 (1927).

2. In *Lusby,* this Court held that a wife may sue her husband for damages where his conduct amounts to "an *outrageous, intentional* tort. . . ." 283 Md. at 335, 390 A.2d at 77 (emphasis added). However, we pointed out that there was "nothing in our prior cases or elsewhere to indicate that under the common law of Maryland a wife was not permitted to recover from her husband in tort when she alleged and proved the type of *outrageous, intentional* conduct here alleged." *Id.* at 358, 390 A.2d at 89 (emphasis added).

The General Assembly has access to relevant information bearing upon these matters more significant than any afforded this Court, bound as it is by the limitations of the record of this judicial proceeding'. *Justice v. Gatchell,* Del.Supr., 325 A.2d 97, 102 (1974). 'If a change is to be effected in the well-settled public policy of this State, such change must be effected by the Legislature and not by this court.' *Saunders v. Hill,* [Del. Supr.] 202 A.2d [807,] at 810 [(1964)]."

Delaware is one of the states still adhering to the doctrine and has consistently declined to overrule it by judicial decision. *See Alfree, supra,* at 162 and cases cited therein.

As recent as March of this year in *Harrison v. Montgomery County Board of Education,* 295 Md. 442, 458-60, 456 A.2d 894, 902-03 (1983),[3] Chief Judge Murphy wrote for the Court:

"When called upon, as here, to overrule our own decisions, consideration must be given to the doctrine of *stare decisis* — the policy which entails the reaffirmation of a decisional doctrine of an appellate court, even though if considered for the first time, the Court might reach a different conclusion. *Deems v. Western Maryland Ry.,* 247 Md. 95, 231 A.2d 514 (1966). Under the policy of *stare decisis,* ordinarily, 'for reasons of certainty and stability, changes in decisional doctrine are left to the Legislature." *Id.* at 102. As the Court observed many years earlier in *DeMuth v. Old Town Bank,* 85 Md. 315, 320, 37 A. 266 (1897):

'[I]t is, in the end, far better that the established rules of law should be strictly applied, even though in particular instances serious loss

---

**3.** In *Harrison,* six members of this Court declined to abrogate the common law rule of contributory negligence concluding that "[i]n the final analysis, whether to abandon the doctrine of contributory negligence in favor of comparative negligence involves fundamental and basic public policy considerations properly to be addressed by the legislature." 295 Md. at 463, 456 A.2d at 905.

may be thereby inflicted on some individuals, than by subtle distinctions invented and resorted to solely to escape such consequences, long settled and firmly fixed doctrines should be shaken, questioned, confused or doubted. . . . It is often difficult to resist the influence which a palpable hardship is calculated to exert; but a rigid adherence to fundamental principles at all times and a stern insensibility to the results which an unvarying enforcement of those principles may occasionally entail, are the surest, if not the only, means by which stability and certainty in the administration of the law may be secured. It is for the Legislature by appropriate enactments and not for the Courts by metaphysical refinements to provide a remedy against the happening of hardships which may result from the consistent application of established legal principles.'

*Accord, Hauch v. Connor,* 295 Md. 120, 453 A.2d 1207 (1983); *Austin v. City of Baltimore,* 286 Md. 51, 405 A.2d 255 (1979); *Osterman v. Peters,* 260 Md. 313, 272 A.2d 21 (1971); *White v. King,* 244 Md. 348, 223 A.2d 763 (1966).

Notwithstanding the great importance of the doctrine of *stare decisis,* we have never construed it to inhibit us from changing or modifying a common law rule by judicial decision where we find, in light of changed conditions or increased knowledge, that the rule has become unsound in the circumstances of modern life, a vestige of the past, no longer suitable to our people. *Williams v. State,* 292 Md. 201, 438 A.2d 1301 (1981); *Adler v. American Standard Corp.,* 291 Md. 31, 432 A.2d 464 (1981); *Condore v. Prince George's Co.,* 289 Md. 516, 425 A.2d 1011 (1981); *Kline v. Ansell,* 287 Md. 585, 414 A.2d 929 (1980). As we said in *Felder v. Butler,* 292 Md. 174, 182, 438 A.2d 494 (1981), the common law is not

static; its life and heart is its dynamism — its ability to keep pace with the world while constantly searching for just and fair solutions to pressing societal problems. However, in considering whether a long-established common law rule — unchanged by the legislature and thus reflective of this State's public policy — is unsound in the circumstances of modern life, we have always recognized that declaration of the public policy of Maryland is normally the function of the General Assembly; that body, by Article 5 of the Maryland Declaration of Rights, is expressly empowered to revise the common law of Maryland by legislative enactment. *See Felder v. Butler, supra,* 292 Md. at 183; *Adler v. American Standard Corp., supra,* 291 Md. at 45. The Court, therefore, has been particularly reluctant to alter a common law rule in the face of indications that to do so would be contrary to the public policy of the State. *See, e.g., Condore v. Prince George's Co., supra,* 289 Md. at 532."

Furthermore, I note that in *Harrison, supra,* we included interspousal immunity in tort actions as an example in a rather lengthy list of areas of the law where "[c]onsistent with these principles, [as quoted above,] we have on numerous occasions declined to change well-settled legal precepts established by our decisions, in each instance expressly indicating that change was a matter for the General Assembly." 295 Md. at 460, 456 A.2d at 903.

In my view, what we said in March, 1983, is equally applicable in June, 1983. While I recognize that many of our sister jurisdictions have abrogated, fully or in part, the immunity rule, some have refused to do so. Many of those which have done so have placed a different interpretation on their Married Women's Act than has this Court in *Furstenburg v. Furstenburg,* 152 Md. 247, 136 A. 534 (1927). In that case this Court clearly held that by the Married Women's Act the legislature did not express an intention to create, as between husband and wife, personal causes of

action which did not exist before the Act. Thus I am not persuaded that we should, in 1983, overrule what has stood as the law for fifty-five years.

Legislative history demonstrates that since 1959 the legislature has considered the matter seven times without enacting any abrogating legislation.[4] This history suggests to me that this is not simply a circumstance of non-action by the legislature but, indeed, one of positive action, i.e., rejection, for whatever reason, of efforts to abrogate the immunity rule. As this Court so aptly observed in *Harrison, supra*,[5] "[a]lthough not conclusive, the legislature's action in rejecting the proposed change is indicative of an intention to retain the . . . doctrine." 295 Md. at 462, 456 A.2d at 904. Moreover, it is patent from reviewing the committee files on the recent bills that the General Assembly is well aware of the status of this doctrine in other jurisdictions. Nevertheless, none of these bills has been enacted. In the face of this history, it appears, to me, wrong for the Court to impose its view of public policy contrary to the apparent view held by the very body closest to the public.

In my view, in reaching its decision in this matter, the majority is placing too much emphasis on the decisions of

---

**4.** The substantive matter of such bills has been varied. H.B. 268 (1959) provided that the subsequent marriage of two parties involved in litigation not act as a bar to a continuance of such litigation or execution of the judgment. S.B. 137 (1967) would have created the right for a wife to bring a tort action against her husband where the tort occurred prior to the marriage. H.B. 1309 (1976) originally gave a married person the right to bring action against his or her spouse in tort for an assault; the bill was amended to include assault and battery. H.B. 124 (1977) provided for an action by either spouse in tort for assault and battery; it was amended so that such actions could be filed only after the filing of a divorce proceeding. H.B. 87 (1978) was essentially the same as H.B. 124 (1977) with a similar amendment; however, the amendment also included a provision to allow the courts to issue an injunction to protect either party from physical harm or harassment. H.B. 653 (1979) would have created a cause of action for intentional torts by either spouse. S.B. 188 (1981) originally addressed intentional torts, but was amended to include all torts. Of the seven bills, only one ever emerged from committee. In 1981, S.B. 188 passed the Senate with a vote of 10 to 5 and was submitted to the House where it died in committee.

**5.** We noted in *Harrison* that from 1966 through 1982, the legislature had considered and rejected 21 bills which would have replaced the doctrine of contributory negligence with a comparative fault system. 295 Md. at 462, 456 A.2d at 904.

other jurisdictions. As the Supreme Court of Kansas observed in *Guffy v. Guffy,* 230 Kan. 89, 631 P.2d 646, 648-49 (1981):

> "After studying the cases from other states, we conclude the decisions are based upon the decisional law, the statutory law and the public policy of each respective state. As such, the cases are not persuasive for the outcome of each case has been dictated by entirely different constitutional and statutory law. For instance, at least three states have interspousal immunity dictated by statute. 92 A.L.R.3d 901, § 5. Some states are community property states in which damages for personal injuries to a spouse become community property. In those states, in the absence of specific statute providing otherwise, the damages recovered would be controlled and managed by the husband. *Windauer v. O'Connor,* 107 Ariz. 267, 485 P.2d 1157 (1971). Some states do not have married women's acts and immunity in those states may be based on the common law doctrine of the unity of husband and wife. Therefore, we do not believe the weight of current judicial authority from other states is either well defined or of significance in deciding the present question for Kansas."

I believe that abrogation of the doctrine of interspousal tort immunity "involves fundamental and basic public policy considerations properly to be addressed by the legislature." *Harrison, supra,* 295 Md. at 463, 456 A.2d at 905. I, therefore, respectfully dissent. I am authorized to state that Judge Rodowsky concurs in the views here expressed.